# UNITED STATES *v.* WESTINGHOUSE ELECTRIC & MANUFACTURING CO.

No. 26.   Argued October 13–14, 1949.—Decided April 17, 1950.

*Roger P. Marquis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Vanech* and *Oscar H. Davis.*

*Milton J. Donovan* argued the cause and filed a brief for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On February 18, 1943, the United States filed a petition in the United States District Court for the District of Massachusetts to condemn certain land and buildings in Springfield, Massachusetts, for use by the Army for a term initially ending June 30, 1943, with a right to renew for additional yearly periods during the existing national emergency, at the election of the Secretary of War.[1] On the same day the District Court authorized the United States to take immediate possession. The respondent, Westinghouse Electric and Manufacturing Company, was lessee of a portion of the condemned property, using it as a warehouse, under a lease dated January 19, 1942, for a term expiring on October 31, 1944. Respondent, in order to comply with the District Court's order of immediate possession, incurred expenses for the removal of its personal property. Subsequently, the Secretary of War exercised his right of renewal and extended the Government's occupancy for two additional yearly periods ending on June 30, 1945. Thus, although the

---

[1] The petition was filed under § 201 of Title II of the Second War Powers Act of 1942, 56 Stat. 176, 177, 50 U. S. C. App. § 632. This section authorized certain officials "to acquire by condemnation, any real property, temporary use thereof, or other interest therein," for purposes related to the war. Plainly it conferred power to condemn interests in realty normally purchased by private persons, including, of course, options to renew.

occupancy taken by the United States was initially for a period less than the remainder of respondent's term, the renewals eventually exhausted respondent's leasehold.

At the time of the initial taking as well as upon each yearly extension, sums were deposited into the District Court as estimated just compensation. It was stipulated that these sums represented the fair market value of the bare, unheated warehouse space taken, leaving open the question whether, as a matter of law, the removal costs incurred by the respondent were to be taken into account in computing just compensation for what was condemned. It was further stipulated that the removal expenses were both reasonable and necessary, and that, taking such removal costs into account, the market rental value of the premises was $25,600 greater on a sublease given by respondent to a temporary occupier than as bare unheated warehouse space.

The District Court ruled that removal expenses should be included in the measure of just compensation, and awarded to respondent the stipulated amount. 71 F. Supp. 1001. The Court of Appeals affirmed, Chief Judge Magruder dissenting. 170 F. 2d 752. The disagreement was due not to differences of independent views but to conflicting meanings drawn from the decisions of this Court in *United States* v. *General Motors Corp.,* 323 U. S. 373, and *United States* v. *Petty Motor Co.,* 327 U. S. 372. The need for clarification led us to bring the case here. 336 U. S. 950.

The *General Motors* and *Petty Motor* cases concerned themselves with the situation in which the Government does not take the whole of a man's interest but desires merely temporary occupancy of premises under lease. *General Motors* held that when such occupancy is for a period less than an outstanding term, removal costs may be considered in the award of "just compensation" to the temporarily ejected tenant—not as an independent

item of damage, but as bearing on the rental value such premises would have on a voluntary sublease by a long-term tenant to a temporary occupier.[2]

In this holding of what is just, within the requirements of the Fifth Amendment, the Court was scrupulously careful not to depart from the settled rule against allowance for "consequential losses" in federal condemnation proceedings. 323 U. S. at 379 *et seq.* When there is an entire taking of a condemnee's property, whether that property represents the interest in a leasehold or a fee, the expenses of removal or of relocation are not to be included in valuing what is taken. That rule was found inapplicable to the new situation presented by the *General Motors* case—inapplicable, that is, where what was to be valued was "a right of temporary occupancy of a building equipped for the condemnee's business, filled with his commodities, and presumably to be reoccupied and used, as before, to the end of the lease term on the termination of the Government's use." 323 U. S. at 380.

*Petty Motor* made clear that the taking of the whole of a tenant's lease does not fall within the *General Motors* doctrine. The reason for the distinction between the two situations was made explicit in *Petty Motor:*

"There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease which is not taken rests upon the lessee. This was brought out in the *General Motors* decision. Because of that continuing obligation in all takings of temporary occupancy of leaseholds, the

---

[2] This holding in the *General Motors* case was the Court's determination, without any congressional action, of what constituted "just compensation" under the Fifth Amendment.

value of the rights of the lessees which are taken may be affected by evidence of the cost of temporary removal." 327 U. S. at 379–80.

While it is true that in both the *General Motors* and *Petty Motor* cases the Government had retained an option to vary the duration of its occupancy—in the former case it could extend, and in the latter it could shorten—the legal significance of such an option with respect to removal costs was not squarely in issue. It is now. Where the Government initially takes an occupancy for less than the outstanding term of a lease but then exercises its renewal option so as to exhaust the entire lease, shall this be treated merely as a temporary occupancy during part of an outstanding lease and thus within the *General Motors* doctrine, or as a taking of the whole lease and hence within *Petty Motor?* [3]

Here, as in *General Motors,* the Government initially took over only part of an outstanding lease. But here the Secretary of War in fact continued the Army's occupancy of the premises beyond the expiration of Westinghouse's lease. Judged by the event, therefore, this case was unlike *General Motors* in that what the Government took was the whole of the lease. It was thus like *Petty Motor.* The formal difference between this case and *Petty Motor* was that in this case the Government began with an occupancy shorter than the outstanding lease with a contingent reservation for its extension, while in *Petty Motor* there was a contingent reservation to shorten an occupancy that nominally exhausted the lease.

To make a distinction between taking a part of a lease with notice that the period of occupancy may be

---

[3] Problems relating to the valuation of renewal options are not before us on this record. It need hardly be said that provision for renewal does not necessitate the same rental for the renewed period as for the initial period. Whether a rental for each renewed period was initially fixed in this case is not disclosed by the stipulated facts.

extended for the rest of the leasehold, and formally taking a whole leasehold with the right to occupy only a portion of it and throw up the rest, is to make the constitutional requirement for just compensation turn on a wholly barren formality. It is barren because a taking of a contingent occupancy by the Government could be cast in either form by those in charge of its condemnation proceedings without the slightest difference to the Government's interest. The reason for condemnation for a period shorter than a tenant's outstanding term with notice that extensions may absorb the balance of the term (*i. e.*, the form in this case), or for condemnation formally for the whole of an unexpired leasehold with notice that the Government's occupancy may be terminated before the outstanding term has expired (*i. e.*, the form in *Petty Motor*), is precisely the same. It is a recognition of the contingencies which may determine the duration of the emergency during which the Government seeks temporary occupancy of leased premises. And so it takes a flexible term, casting the burden of the contingency upon the ousted tenant.

Under either type of condemnation the United States may in fact move out before the ousted leaseholder's term has expired, thus imposing upon him the duty to return to the premises or make some other burdensome adjustment. In that event, he is placed in precisely the same boat as was the General Motors Corporation, and the cost of removal is therefore admissible in evidence "as bearing on the market rental value of the temporary occupancy taken." 323 U. S. at 383. Contrariwise, under either type of condemnation the Government may continue its occupancy throughout the tenant's term. In that event, the situation is governed by *Petty Motor* and removal costs may not be taken into account. The final severance of a lessee's occupancy as against a temporary interruption of an outstanding leasehold, even though not de-

finitively fixed at the outset, is a difference in degree wide enough to justify a difference in result.

The test of the outcome—is the Government merely a temporary occupier of an unexpired leasehold or has it absorbed the term of the lease?—has actuality behind it. Until events have made it clear, we cannot know whether the tenant will have to move back into his leased premises or make some other adjustment, and thus we cannot know whether the reason for the *General Motors* doctrine operates.

Condemnation for indefinite periods of occupancy was a practical response to the uncertainties of the Government's needs in wartime. Law has sufficient flexibility to accommodate itself to these uncertainties by making what is a relatively minor item await the event. To do so does not keep the litigation open longer than it has to be kept open, because the total award for the Government's occupancy cannot be determined until its duration is known. The usual rule for ascertaining value at the time of taking is not disrespected if one item is made a function of the future because only then can it be known whether that item forms a part of what has been "taken." The alternative is to require a forecast of the possibility that the tenant will have to move back into the premises. The factors on which such a forecast must be based are too contingent, too unique for guidance by experience, to permit rational assessment. This is a situation where the law should express "a judgment from experience as against a judgment from speculation." *Tanner* v. *Little*, 240 U. S. 369, 386. Or, as it was put by Mr. Justice Cardozo for the Court in a relevant situation: "Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." *Sinclair*

*Refining Co.* v. *Jenkins Petroleum Process Co.,* 289 U. S. 689, 698.

An award based on removal costs will of course be delayed until it is known whether the Government's occupancy has exhausted the tenant's leasehold. But this presents no real administrative difficulties. That the essential facts here became known before the time for judicial determination hardly makes this case atypical. Even in the cases where the event is still open, the cost of moving out, insofar as it is to be reflected in just compensation, may be treated as a segregated item. Thus, its amount may be ascertained at an early stage of the judicial proceedings, but the judgment made conditional upon the outcome of the Government's occupancy. And rental payments due from the Government need not be postponed. So long as the duration of the Government's occupancy is undetermined, the District Court must necessarily retain the case for the periodic determination and payment of rental compensation. This is so in the absence of any problem arising out of removal costs. No unfairness or embarrassment to the displaced tenant is thus involved by leaving liability based on removal to await the event.

In the case before us, it was known at the time of trial in the District Court that respondent's term had been exhausted by the Government's occupancy. Accordingly, the judgment is reversed insofar as it awards $25,600 to respondent.

*Reversed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON, dissenting.

Difficulties in resolving the controversy over removal costs are caused by a condemnation policy under which the Government, in taking temporary use of property,

also condemns an option to renew or shorten the period of use. While we have decided cases in which questions concerning options were raised, *United States* v. *General Motors Corp.*, 323 U. S. 373; *United States* v. *Petty Motor Co.*, 327 U. S. 372, I think that the Court has not fully faced up to the implications of the optioning policy.

Valuation problems of the past have been simple contrasted to those the new policy imposes upon courts. Condemnation in the main was of title to physical properties, and the problem of just compensation was one of ascertaining the equivalent in money at the date of appropriation—a date that had already arrived. The courts were dealing with *a single point of time* and with facts and conditions which were at least in experience, not prophecy.

In recent years, the Government embarked upon a new type of condemnation.[1] It does not take title to the property and put into the pockets of the owners the current money equivalent. Instead, it keeps the owners' capital tied to their investments and pays them only an estimated value of its future use. This requires courts to predict values over a period of time.

Valuing time is the essence of much business and of most speculation. All options, futures, insurance contracts, leases, investments, deferred deliveries and commitments involve an appraisal of time. And though it takes us into the realm of pure conjecture, it may be possible, however unsatisfactorily, to fix values for rights of future occupancy if the period of the occupancy can be known.

The Government, however, has adopted the policy of expropriating for a "flexible term" by condemning a right

---

[1] See Just, *Condemnation Procedure During World War II*, 12 Geo. Wash. L. Rev. 286; Dolan, *Present Day Court Practice in Condemnation Suits*, 31 Va. L. Rev. 9.

to shorten or to extend the use from time to time as may please it. This type of condemnation denies courts even a defined time period to evaluate, and it is small wonder that the Court concludes this leaves the factors too contingent and unique "to permit rational assessment." This raises the question whether Congress ever authorized a type of expropriation that can not be rationally compensated.

The statute upon which the taking in this case rests—one of the broadest of its kind ever enacted by Congress—authorizes various officers ". . . to acquire by condemnation, any real property, temporary use thereof, or other interest therein, together with any personal property located thereon or used therewith, that shall be deemed necessary, for military, naval, or other war purposes . . . ." 56 Stat. 177. Its legislative history provides no explanation of the language which authorizes taking "any real property, temporary use thereof, or other interest therein," [2] nor does it offer any reason for its inclusion.[3] But Congress had no apparent expectation

---

[2] *E. g., cf.* S. Rep. No. 989, 77th Cong., 2d Sess. 4 (1942). (The bill covers interests in real property, including easements and other rights appurtenant thereto.) Hearings before the House Committee on the Judiciary on S. 2208, 77th Cong., 2d Sess. 15 (1942). (It would enable the acquisition of leaseholds or of any other property.)

[3] Title II of the Second War Powers Act, 56 Stat. 177, 50 U. S. C. App. § 632, the statute here involved, was amendatory to the Act of July 2, 1917 (40 Stat. 241), To Authorize Condemnation Proceedings of Lands for Military Purposes. As originally introduced, the 1917 Act contained authorization for only the condemnation of "any land, or right pertaining thereto." 55 Cong. Rec. 3632 (1917). But, upon the unexplained recommendation of the then Secretary of War, the words "temporary use thereof or other interest therein" were inserted after the word "land." See H. R. Rep. No. 83, 65th Cong., 1st Sess. (1917); 55 Cong. Rec. 3991, 4130–4131, 4263 (1917). These words were carried over by the amendatory Act without comment.

See generally, Senate Committee Print, Statements in Executive Session on S. 2208, 77th Cong., 2d Sess. 6–7, 13–16; S. Rep. No. 989,

that it would authorize condemnations for unstated periods of time.[4]   The announced purpose of the legislation was to increase the number of federal officials authorized to institute condemnation proceedings, to authorize the possession and use of property prior to the completion of condemnation proceedings, and to eliminate uncertainties regarding the taking in the same proceeding of personalty located upon or used along with the real property being condemned.[5]   And though authority for condemning less than a fee had existed theretofore, the whole question of taking temporary uses was in some doubt.[6]

It is plain that Congress contemplated only such takings as were necessary.   We should give this a broad construction; we may even go so far as to say that the necessity for a taking is a political or policy question not usually subject to judicial review.   But the statute implies some foundation in necessity and nothing can be

---

77th Cong., 2d Sess. 4 (1942); Hearings before the House Committee on the Judiciary on S. 2208, 77th Cong., 2d Sess. 10, 15–23 (1942); H. R. Rep. No. 1765, 77th Cong., 2d Sess. 6 (1942); 88 Cong. Rec. 1639–1641, 1644–1645, 1647–1650, 1653–1656.

[4] See, e. g., testimony of Attorney General Biddle in Hearings before the House Committee on the Judiciary on S. 2208, n. 2, supra, at 19:

"Mr. HANCOCK of New York. Is it possible under a condemnation act to acquire temporary use?

"Mr. BIDDLE. Yes, sir.

"Mr. HANCOCK of New York. In that case the title would revert back to the original owner after the temporary use.

"Mr. BIDDLE. Yes.

"Mr. HANCOCK of New York. But you can acquire property by a lease?

"Mr. BIDDLE. Yes.   You can condemn it for a *certain length of time.*"   (Emphasis added.)

See also materials cited in nn. 2, 3, supra, and 5, 6, infra.

[5] E. g., Committee Print, n. 3, supra, at 6; S. Rep. No. 989, n. 3, supra, at 4; Hearings, n. 3, supra, at 10, 15–23; H. R. Rep. No. 1765, n. 3, supra, at 6.

[6] See 88 Cong. Rec. 1644–45, 1647–48, 1653.   See also n. 4, supra.

less necessary than condemnation of an option to take property or its possession.

The United States needs no such option, for its inherent condemnation power, by its very nature, is a perpetual option to take, at any time, any property it needs. The effect of condemning an option to take at some future time is to increase the element of uncertainty and speculation in the liquidation of an award. Furthermore, such purpose is wholly one-sided. If, let us say, the price level should fall, the Government, even though it wants the property, is not bound to keep it on the option terms. That is the essence of option. But it may abandon the option and take the property under a new declaration, thereby getting a new valuation in the light of the lower price level. If, however, prices go up, the Government can use its condemned option to keep the owner from enjoying the rising value of his property as other owners may do. The taking of a term with an option to lengthen is therefore no more than a hedge against inflation.

This same one-sidedness inheres in the policy of taking a term with an option to shorten. Specific authority exists for government officials to dispose of surplus properties taken for war purposes; [7] indeed such authority is contained in the very statute under consideration.[8] Various officials are given power to "lease, sell, or otherwise dispose of" any properties taken by condemnation which become surplus or unnecessary. And so, if the Government condemned for a term with an option to shorten, and then determined that the property so taken was no longer necessary, it could sell, lease, or otherwise dispose of the remainder of the term at the then current market price. This it would certainly do if the price level had risen. But if prices had fallen, it could avoid the loss of trading

---

[7] *E. g.*, 54 Stat. 712, 50 U. S. C. App. § 1171 (b).

[8] 54 Stat. 713; 56 Stat. 177. And see 88 Cong. Rec. 1648.

on the open market by exercising the option to shorten, cut down the term and put on the owner the burden of salvaging its surplus property. The taking of a term with an option to shorten is therefore no more than a hedge against deflation.

It seems unlikely that Congress intended to authorize such speculative transactions as result from an option to increase or decrease the time period. If we change the terms of the taking so that the time is known but the space is indefinite, the hazard to the Government becomes quickly apparent; if we had a declaration taking such part of a property as from time to time the Government would want, we would have to compensate on the basis that the taking was of the maximum within its terms. Such indefinite takings invite excessive awards, for the speculation involved is involuntary with the claimant and its outcome controlled by, and hedged in the interest of, the Government. *Cf. United States* v. *Certain Parcels of Land, etc.,* 55 F. Supp. 257, 265.

The Court gives up the effort to value what is taken and determines to postpone determination of compensation to await the event. This expedient recognizes, but does not fairly solve, the problem engendered by this type of condemnation. If there is a present taking, the property owner is entitled to pocket his compensation. It seems hardly fair that the owner, dispossessed for a time which he can not learn, must wait indefinitely to be paid anything except bare rental, regardless of the other expense he may be put to. How can the owner know whether to sell his removable property, store it, or perhaps to liquidate his business, or seek a new location, without knowing the length of time for which the Government is taking his premises? The property owner cannot await the happening of the event to make these essential business judgments. To let the Government take an option and pay for it only if it decides to exercise it, is to give

the Government a "Heads I win; Tails you lose" position in a gamble the property owner has not willingly joined.[9]

I think we should hold the effort to condemn options to be a nullity for want of congressional authorization and determine claims for just compensation on the basis of the fixed term specified in the declaration. If the Government, upon expiration of the fixed term, desires

---

[9] It is unnecessary, if Congress has not authorized such condemnations, to rely on any constitutional doubts concerning them. But we should note that a local scheme not too unlike the Government's condemnation policies has been successfully challenged on constitutional grounds in at least one jurisdiction. The General City Law of New York provides that city planning boards may file master plans providing for the development of the city, and "for the purpose of preserving the integrity of such official map" no permits, as a general matter, will issue for building in the bed of any street or highway laid out on the map; and this, despite the fact that the map may at all times be modified and the proposed construction may never be carried out. N. Y. General City Law (McKinney, Consol. Laws of N. Y., Supp. 1949) §§ 26–39. This law empowers a municipality to restrict the use of private property which it may at some future time decide to take. See *Matter of the City of New York*, 196 N. Y. 255, 259, 89 N. E. 814, 815–816. It grants, in effect, a form of restrictive option. And although it was drafted with an eye to avoiding the pitfalls which brought invalidation upon an earlier similar scheme, see *Forster* v. *Scott*, 136 N. Y. 577, 32 N. E. 976, it has already been subjected to a preliminary constitutional skirmish. See *Platt* v. *City of New York*, 196 Misc. 360, 92 N. Y. S. 2d 138, rev'd on other grounds, 276 App. Div. 873, 93 N. Y. S. 2d 738. And other courts have indicated that, where a right is so vague that a judicial determination cannot be made of just compensation for its taking, the right to expropriate fails, see *Albright* v. *Sussex County Lake & Park Comm'n*, 71 N. J. L. 303, 307–308, 57 A. 398, 400–401, and that certain personal rights are not subject to condemnation. *Hamilton, Glendale & Cincinnati Traction Co.* v. *Parish*, 67 Ohio St. 181, 192–193, 65 N. E. 1011, 1014. These cases do not govern us, but they indicate that we are on the very fringes of unconstitutionality and might well indulge in an interpretation of the statute which will keep us clearly out of it.

to continue in possession, it may file a new declaration of taking and have the value of that term fixed in the light of conditions that then prevail. If it abandons the property before the fixed term expires, it has surplus property on its hands to dispose of as it may choose. These are not, of course, very satisfactory results, but they would come nearer obeying the constitutional mandate of "just compensation" than the delayed decision course adopted by the Court.