**UNITED STATES v. CERTAIN PARCELS OF LAND, TOWN OF CLARKS- VILLE, VA., et al.**

No. 1940.

United States District Court
E. D. Virginia, Richmond Division.

April 8, 1952.

A. Carter Whitehead, U. S. Atty. and Harris Grimsley, Sp. Asst. to the U. S. Atty., both of Richmond, Va., William Amory Underhill, Asst. Atty. Gen., Ralph J. Luttrell, Anne S. Bell, Attys., Department of Justice, Washington, D. C., for the United States.

George E. Allen and Ashby B. Allen, both of Richmond, Va., Frank W. Hancock, Jr., and B. S. Royster, Jr., both of Oxford, N. C., for Town of Clarksville.

BRYAN, District Judge.

The point of this case is whether in taking the sewer system of a municipality by eminent domain, the United States, to make just compensation, must pay (a) for a sewage treatment plant when none existed at the time of the take, if such a plant is required by State law to be included in any substitute system, and (b) pay for the cost of operating lift stations which must be added in a substitute system but were not necessary in the old because it worked by gravity.

When its gates are closed the John H. Kerr Dam and Reservoir[1] (formerly the Bugg's Island Reservoir) of the United States on the Roanoke River, will inundate nearly 41% of the Town of Clarksville, Virginia. The general object of the instant action is the determination of just compensation for such part of the town's present water and sewer systems as will be flooded, that is, for about 70% of the systems.

The parties have stipulated that just compensation shall be made in kind and in money as follows:

1    By the relocation, rearrangement or alteration of portions of the existing systems by the Government, according to certain specifications and drawings furnished by the town, and the subsequent conveyance thereof to the town; plus

2.    The cost of such of the following items as the Court, without a jury, shall declare to be compensable elements in the fixing of just compensation:

(a) Construction of a sewage treatment plant; (b) operation and maintenance of five lift stations, the relocated or altered sewerage system admittedly requiring them; and (c) engineers' fees incident to the preparation of the specifications and drawings and the construction of the contemplated facilities. If the Court allows any of these items, the quantum of the award therefor would be fixed by a jury. Each side reserved the right to appeal the decision of the trial court upon any issue submitted by the stipulation.

Originally the stipulation was conditioned upon the procurement by the town, in limine, of approval of the Virginia State Water Control Board of the relocated and altered system, and of a permit to continue the discharge of raw sewage into the River. On the application the Board approved the plans and work but only on the terms that a sewage treatment plant be included in the plan. Thereupon the Government, understandably, declined to proceed under the stipulation. However, the stipulation was soon restored by an amendment to the effect that the undertaking of the United States, to relocate or alter the system, should be considered fully performed when it connected the new construction to the retained portion of the existing system, wherever the plans and specifications prescribed such connections. The Government was thereby relieved of responsibility for the disposal of the sewage, save as the Court should rule on its liability for a treatment plant.

On pertinent testimony the Court found the stipulation to be fair, to follow the law's pattern for fixing just compensation, and to be authorized by the town authorities as well as by the United States. It then

1. Flood Control Act, Dec. 22, 1944, Public Law 534—78th Congress, 2d Session, 58 Stat. 887; Civil Functions Appropriation Act, 1952, Public Law 203, 82nd Congress—1st Session, 65 Stat. 616, changing the name.

began the ascertainment of just compensation by admitting the stipulation in evidence, approving it, and later hearing the evidence and arguments of the parties on the issues presented. In the course of the hearings the United States conceded that it should pay the engineers' fees, (c) supra, upon the relocation of the two systems and upon the treatment plant if held to be a compensable item. Previously the Government had moved for an order of possession. It was granted, effective September 1, 1952, contingent upon the deposit in Court of $304,000. The money was tendered but, as the effect of the stipulation was to dispense with the deposit and entitle the United States to immediate possession, it was not received.

This chronicle of the litigation discloses that we are not now concerned with the water system, the engineering fees, or any part of the sewerage system save the treatment plant and the operating cost of the lift stations.

On these the case for the town is this. Presently the raw sewage is discharged into the Roanoke River at four places. This system, built some twenty years ago, has been quite satisfactory. The grade of the interceptor and outfall sewers has emptied them by gravity, and the velocity of the river current, it is said, has been adequate to cleanse satisfactorily the river and its banks of the sewage. The State Water Control Board of Virginia, organized under a legislative desire to "prevent any increase in pollution and reduce existing pollution"[2] of the waters of the State, lawfully issued to the Town of Clarksville a permit, dated April 2, 1947, to continue to run its sewage into the Roanoke. Under the policy of the Board the license was indefinite in its term, customarily not to be revoked or modified until a substantial change should be made in the use or layout of the system, or until such time in the future the Board should fulfill its program to prohibit throughout Virginia all use of her waters for such purpose. Except for Government's project, contends Clarksville, the sewerage facilities could and would remain as now existent; that the Government alone has created the necessity for the treatment plant as well as the lift stations; and that the Government should pay for them as constituent parts of a substitute system. Otherwise, the town is burdened, without reimbursement, by these capital and recurring charges.

The Government agrees that the maximum flood of the dam, the contour line of 320 feet above sea datum, will necessitate abandonment of the four existing outfalls; that good engineering advises the construction of a single and somewhat elevated point of discharge, as determined in the town's plans and specifications already mentioned; and that by reason of the topography of the land, over which the new pipes will run, the sewage will have to be boosted by pumps and forced to the outlet, the function of the five lift stations. However, the Government denies that the untreated sewage will not be disposed of as well by the waters of the proposed reservoir as it now is by the unobstructed flow of the river. The position of the United States is that while the measure of just compensation here is a substitute system, such replacement is to be neither more nor less than the system taken—that it has no responsibility for a sewage treatment plant for it took none. The estimated cost of the treatment plant is, roughly, $103,000, exclusive of the cost of the alteration and relocation of the system approximated at $351,000.

The Court finds that the raw sewage from the proposed new system would be carried away as well by the dammed water as by the river in its natural course. The flow of the Roanoke will be reduced but not stopped. The benefit of the greater velocity, as a cleansing power, will be more than compensated for by the greater depth of the reservoir waters. Disposal of the sewage is more complete, through dilution and diffusion, in the deep waters than in the more rapid but shallower current. Indeed, the outlets of the existing system are now covered by less than 1 foot of water 60% of the year, that is 219 days, mostly

---

2. Acts of General Assembly of Virginia, 1946, c. 399, p. 960; Va.Code of 1950, title 62, c. 2, sec. 10 et seq.

in the hot summer months. Less than 4 feet of water covers them 90% of the year. With the dam, even the present outlets would be 30 feet under water in the summer and at least 20 feet in the winter, the water being kept at a higher level in the reservoir during the summer. The outfall of the new system will be equally submerged. These facts and these views were offered without contradiction by qualified hydraulic and sanitary engineers. The conclusion of the Court is that the Kerr Dam would not aggravate, but rather would diminish, the dangers incident to the pollution of the Roanoke River by the untreated sewage from Clarksville.

■ This conclusion points uncompromisingly to another—that the Government project has not created the need for a sewage treatment plant at Clarksville. Nor has it accelerated the need. The need was there, because the pollution was there, before the Government came; and the need will continue solely because the pollution will continue, always of the town's own making. It is, therefore, not a damage resulting from the assertion of eminent domain.

■ Likewise, the Government's condemnation was not an imprecation of the Board's order upon the town. For a surety, the Board's policy was to recall a municipality's permit to pollute adjacent waters whenever its sewer system is materially altered, the Government forced the alteration at Clarksville, and thereupon the Board ordered Clarksville to install the treatment plant. But even on these premises the deduction cannot be drawn that the Government has made the plant an obligation of the town. The town's pollution of the river fastened the obligation on the town. Announcement of the proposed change in the system merely fixed the maturity of the obligation. It has always been owing. The obligation was created when the General Assembly of Virginia adopted the law for the purification of the waters of the state.[3] Further evidence of the constant impendency of the obligation is found in Regulation No. 1

of the Board, effective April 2, 1949, directing that a program be developed by every one discharging sewage into State waters to reduce such pollution, each program to include the preparation of plans for a treatment plant. Moreover, the previous indulgence of the Board towards the town was not a right or property of the town, even if it was terminated by the action of the Government. Compensation could not be claimed for its destruction or impairment.

So, in actuality, the sewage treatment plant is not a creature or consequence of the John W. Kerr project, and is not in fact a compensable item for which the United States should be responsible in this proceeding.

■ Adverting to the lift stations, the Government has acknowledged its duty to build them as an integral part of the substitute system. Clarksville demands in addition, as a part of the substitute system, a sum equal to the present value of the annual maintenance and operational expense of the five lift stations for a period of 99 years, the estimated life of the stations. The annual cost is tentatively placed at $4,700, and the present worth of the 99 years' expense is put at $168,370. The latter is the amount necessary to provide the service annuity of $4,700 for 99 years, computed at 2½%.

Apart from the questionable soundness of this method of calculation of the claim, the Court finds that in fact future operation and maintenance are not factors of just compensation. The United States in furnishing a system similar to the old, plus the lifts to make the new system functionally equal to the old, has replaced what it has taken with a fair equivalent. Future use of the alternative system is neither within, nor impaired by, the seizure of the original. Again, if greater expenditure for operation and maintenance is required than before, that is a damage too consequential to ascribe to the take. Too, it is conjectural, speculative and prophetic. The justice of the denial of this claim is sharply demonstrated by the converse of the prop-

3. Acts, supra, 1946, c. 399, p. 960; Va.Code of 1950, supra, title 62, c. 2, sec. 10 et seq.

osition—the town should receive no less for its system if the substitute could be operated less expensively than the first. If a highway were taken, surely the condemnor would not have to provide for the future maintenance of the one built in its place, though the latter be of a design or character necessitating more care than its predecessor. When a residence, business premises, or a leasehold is condemned, the inquiry does not embrace a comparison of cost of maintaining another property elsewhere.

■ In these conclusions the Court has not overlooked the argument of the condemnee that the substitute must meet the modern standards of efficiency and adequacy enjoined upon the municipality by current statutes, regulations and scientific knowledge—that it cannot replace an outmoded system with another also obsolete[4]—that a sewer system without a disposal plant is now an anomaly. This doctrine, however sound, is not here violated. The treatment plant sought is an extra or an extension to the old system; it is not an improvement within the old system. Akin in nature is the claim of the town for operational and maintenance cost; this fund is something over and beyond the retired system.

■ On the facts here, we have held, the propositions urged by the defendants are not sustainable. In law, we find, they are no stronger. The town must receive "the full and perfect equivalent in money of the property taken." U. S. v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed 336. As its property was an instrument of public use without market value and must be replaced, just compensation therefor is properly measured by the cost of a substitute. Brown v. U. S., 263 U.S. 78, 83, 44 S.Ct. 92, 68 L.Ed. 171; Mayor and City of Baltimore v. U. S., 4 Cir., 147 F.2d

786, 790; U. S. v. Wheeler Tp., 8 Cir., 66 F.2d 977, 984. But equivalence is the touchstone of just compensation for the condemnor as much as for the condemnee. Kimball Laundry v. U. S., 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765. Payment or duplication cannot be made of something not taken, here a sewage treatment plant. U. S. v. City of New York, 2 Cir., 168 F.2d 387, 390. A plant of equivalent efficacy will be delivered to the town. That fully satisfies the Fifth Amendment. Payment, in addition, for operation would be an endowment or subsidy. Such an allowance has uniformly been denied, either because it is representative of nothing taken or its ascertainment is mere divination. U. S. v. 25.4 Acres of Land, D.C., 71 F.Supp. 255, 259, affirmed U. S. v. City of New York, 2 Cir., 168 F.2d 387, supra; U. S. v. General Motors, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311; U. S. v. Petty Motor Co., 327 U.S. 372, 377, 66 S.Ct. 596, 90 L.Ed. 729; U. S. v. Westinghouse Co., 339 U.S. 261, 264, 70 S.Ct. 644, 94 L.Ed. 816; U. S. v. Commodities Trading Corp., 339 U.S. 121, 127, 70 S.Ct. 547, 94 L.Ed. 707.

Unless the parties can agree upon the amount of the engineering fees within 30 days, the Court will impanel a jury for that determination. The action will be held open for payment of such fees, and completion of the new water and sewer systems, after which a judgment will be entered declaring that just compensation has been made.

This memorandum will be adopted by the Court as its findings of fact and conclusions of law upon the issues submitted. Counsel for the United States will prepare an order in accordance with the views herein expressed, and after tendering it to opposing counsel for consideration as to form, will present it for entry.

4. Vide: U. S. v. Wheeler Tp., 8 Cir., 66 F.2d 977, 985.