UNITED STATES of America, Plaintiff,

v.

Building known as FLOOD BUILDING, 870 Market Street, SAN FRANCISCO, CALIFORNIA, Flood Estate, et al., Defendants (two cases).

Nos. 30319, 30675.

United States District Court
N. D. California, S. D.

Dec. 19, 1957.

Lloyd Burke, U. S. Atty., John Lynch, J. Harold Weise, Asst. U. S. Attys., for plaintiff.

Chickering & Gregory, Frederick Fisk, San Francisco, Cal., for defendants.

OLIVER J. CARTER, District Judge.

The United States, on January 29, 1951, filed a complaint in condemnation taking the temporary use and occupancy of the Flood Building, a twelve-story office building located at 870 Market Street, in San Francisco, California.

The government, needing the space for the housing of federal agencies, took possession the following day.

It appears that the upper ten floors of the building, constituting about 168,000 square feet of office space, were practically empty on the date that the government filed its complaint. The reason for this is that the owners of the building had, seven years previously, entered into a long term lease of the premises with the Woolworth Company, which provided for delivery of possession to Woolworth on February 1, 1951. The owners were to make diligent effort to deliver possession free and clear of all tenants, as the lease contemplated destruction of the existing twelve-story building by the new tenant Woolworth, and the erection of a new one in its stead.

Shortly after taking possession of the property, the government commenced an extensive program of alteration in the interior of the building. This was confined to the top ten floors of the building, as the basement, street floor, and second floor had within a short time been excluded from the taking and possession thereof restored to the owners. The offices in the top six floors of the building had been rented almost exclusively to medical and dental tenants. The third, fourth, fifth and sixth floors had contained many commercial tenants, including drugstores, laboratories, and other activities affiliated with the medical and dental professions. Those offices which had been occupied by doctors were typically a large office which had been made into a suite of small offices by the installation of subdividing partitions. Such a suite would characteristically contain a reception room, examining room, a laboratory, and a consultation room. In these offices, much of the government's alterations comprised the removal of the inner partitions, sinks, work benches cabinets, terminating the exposed piping and electrical wiring at the main walls, and necessary plastering and repainting; the final result being one large office where formerly a suite had existed. In the other offices, such comparable changes were made as were necessary to make the space suitable for government occupancy. Some fixtures were installed by the government, such as radiators, electrical fixtures and some asphalt tiling, and deteriorated areas were renovated.

The government, continuing in possession under a second condemnation action filed in June 1951, annually renewed the taking of the use and occupancy in 1952 and 1953. On June 30, 1954, the government surrendered the premises to the owners.

■ The parties have agreed upon what amount should be paid for the use and occupancy of the premises, i.e., the reasonable rental value for the forty-one months that the government was in possession, and compensation for that item is not under consideration here. But they were totally unable to agree upon what liability the government incurred by reason of the alterations made to the premises, and that decision must now be made by the Court.

It is the position of the owners of the building that the United States was required to restore the building to the same condition that existed when the government took it in 1951; that in electing not to restore it, the government thereupon became liable to the owners for the reasonable cost of restoration, plus rental for a period which would be required to restore. By restoration, the owners mean the replacement or rebuilding of the several medical-dental suites that formerly existed in the building, and restoration of all other conditions as they existed on the date of the government taking in 1951.

The United States insists that the owners have no immutable right to the cost of restoring the building to its condition at the time of the taking. Just compensation is satisfied under the government's theory by paying to the owners the diminution in market value of the property, if any, caused by the government's alterations; that the costs of restoration must be paid only if those costs are less than the diminution in market value.

Trial was had upon the issues underlying the dispute, and substantial evidence was taken. As to what it would cost on June 30, 1954, to restore the building to its condition as of February 1, 1951, the date of taking, the owners' evidence shows approximately $600,600; the government, disputing only the cost of major items, put in evidence showing an amount of $401,000. Both of these figures are based upon the cost of new materials, and do not reflect any reduction for depreciation. The government contends that an allowance would have to be made therefor should restoration be allowed.

In addition to this, the defendant owners claim the reasonable rental value for the time required to restore would be $178,000; the government claims a lesser amount and a shorter time, and its evidence shows an amount of $40,000. Therefore, without giving consideration to the question of depreciation, it is apparent that the minimum cost of restoration as computed by the government would be approximately $440,000.

■ As to the effect upon market value caused by the taking, the government witnesses each were of the opinion that the market value of the building was $225,000 greater when returned by the government in the altered condition in 1954 than it would have been on the same date had it been returned in the same condition in which it was taken. The main premise on which this opinion was based is that the highest and best use of the Flood Building at the time of return was for general office use, and not for medico-dental use, and that restoration of the building to its former condition would lessen its market value. The defendants' witness, whose firm has for several years participated in the management of the Flood Building, estimated that the owners had suffered a $400,000 loss in market value. This figure was reached by assuming a higher net return annually from medical-dental occupancy, and then capitalizing the amount of increased return. While capitalization of rents is evidence of market value, United

States v. Waterhouse, 9 Cir., 1943, 132 F.2d 699, the conclusion of this witness was premised upon an assumption of continuing high utility of the building for medical-dental occupancy, a major point of dispute. His assumed net return for medical dental rentals is substantially higher than that which the owners realized from such tenants in their best years in the late 1940's and he readily conceded that the owners had a long hard fight before they would arrive at the conditions reflected by his computations. Taking into consideration the testimony of each of these three witnesses, plus the conditions existing just prior to the government taking in 1951, this Court finds that the building suffered no diminution in market value by reason of the taking, or the changes made by the government during its occupation; that the fair market value of the building when returned on June 30, 1954, was as great as it would have been had it been returned on that date in the condition in which it was taken in 1951.

The question then is whether just compensation requires the government to pay the owners the cost of restoration plus rental value for the time required to restore where that cost approximates $441,000, but where the market value of the property has not been diminished by the taking, use and alterations made by the government.

The Court is disposed to rule in the negative, and hold that under the facts here presented the measure of just compensation is the diminution of market value, if any, and not the cost of restoration.

The practice of the government in taking only the temporary use and occupancy of property appears to be one of fairly recent origin. Only a few cases have dealt with the specific problem before this Court, and they are not uniform upon the measure of damages to be employed. The owners here rely heavily upon the case of United States v. 37.15 Acres of Land, More or Less, in Mariposa County, D.C.1948, 77 F.Supp. 798, 802, decided by Judge Goodman of this Dis-

trict. There the government condemned the use and occupancy of the Ahwahnee Hotel in Yosemite National Park in 1944, for use as a naval convalescent hospital. The government made some structural changes in the hotel and erected a number of temporary structures on the grounds. When the hotel was returned to the owners, extensive refinishing and repair was necessary to the walls, floors, and replacement and repair of much of the furniture and fixtures was necessary. The owners of the hotel restored the premises to its original condition, and were successful in recovering substantially the cost of restoring the premises. While the government did not dispute the right to recover the reasonable cost of restoration, the view of Judge Goodman was clear, for he said, "It is not, and clearly could not be, disputed that the United States was obligated to return the hotel together with its equipment and furnishings, to the owner upon the termination of the term, in as good a condition as when received, reasonable wear and tear excepted. * * * However, the government elected not to restore the premises, repair the damage caused to real and personal property lost or destroyed, but left that to be done by the owners. Therefore it would follow that the United States is liable for the reasonable cost of restoring the premises and personal property and also for the reasonable value of the use of the premises during the period of time required to accomplish such restoration."

The case of United States v. 14.4756 Acres, D.C.Del.1947, 71 F.Supp. 1005 contains similar language. There the government condemned a portion of a farm adjacent to a defense plant, and erected thereon a housing project for war workers. While the government was still in possession, proceedings were had to determine the compensation owing to the owner; rejecting his claim for *immediate* compensation for the changes made by the condemner, the court declared that the government had a duty to restore the premises to the condition existing at the time of the taking. The case of In re Condemnation of Lands, D.C.Ark.1918,

250 F. 314, 315, arising out of a temporary condemnation of Arkansas farmland for an Army camp in the First World War, also contains some pertinent language. Noting that the army might erect trenches and roads and destroy improvements, all of which would destroy the value as farming lands, the court said: "The government must * * * return * * * in as good a condition as when [it] took possession, * * * [the] natural wear and tear excepted * * * [or] pay such sums as damages as will enable the owner to put the land back in the condition it was when the government took possession." See also, United States v. 266.33 Acres, D.C.Wash. 1951, 96 F.Supp. 647.

There are, on the other hand, two cases decided in this District by Judge Goodman prior to his 1948 Ahwahnee Hotel decision, supra, wherein the measure of damages for changes made by the government was defined in terms of the diminution in value occasioned to the premises. In United States v. 60,000 Sq. Feet of Land, D.C.1943, 53 F.Supp. 767, 771, the government condemned a hotel in Oakland, California, and converted it to a military hospital. In response to the condemnee's demand for compensation for the alterations which had been made, it was stated that the compensation was to be an "amount representing the difference between the value of the whole fee and the value of the property as of the date of its return by the government." In United States v. 5,901.77 Acres of Land in Marin, D.C.Cal.1946, 65 F.Supp. 454, 456, the government condemned some shore property and made changes enabling the property to be used for ammunition dumps, etc. There it was said respecting the compensation owing for physical changes made in the land, that "such compensation (was) to be determined on the basis of the amount by which the market value of his property may have been diminished as a result of such uses."

This Court is not disposed to reconcile these cases respecting the measure of damages to be applied, nor to determine that either measure is the correct one to

be used in all cases. In none of these cases is there sufficient factual identity with the case at bar to justify an indiscriminate adoption of the measure of damages there used.

Moreover, in none of them does it appear that the measure of damages was contested by either of the parties. This may well be attributable to the fact that in many cases there would be no difference in result, regardless of which measure was adopted. If property is of such a kind that damage or destruction deprives it of ordinary utility, and economic necessity dictates that it be restored to its original condition, it would seem that the cost of restoring it would approximate the diminution in market value suffered. But the important feature of this case is that the government alterations did not impair the utility of these premises as an office building. When the government seized these premises in 1951, it did not disrupt a going medical-dental operation, but seized the building after the owners had themselves vacated all the medical tenants in contemplation of demolition. The changes effected by the government after taking possession did not wreak havoc and destruction to the interior; what was accomplished was that the offices were converted to general office space. While the changes contemplated and were designed for occupation by governmental agencies, when completed the offices were equally suitable for occupation by commercial type tenants, and owing to the excellent location of the building in downtown San Francisco, its continuing utility can readily be perceived.

The United States Supreme Court, though it has made some major decisions regarding just compensation in this relatively new field of temporary takings, has never addressed itself to the precise issue which is involved here. United States v. General Motors, 1945, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, holds that the temporary condemnee has a right to compensation, distinct from the rental value, for fixtures and other items destroyed during the government's occupation. But as to the measure of compen-

sation in such a case, the only apposite language found is that used by the Court in Kimball Laundry Co. v. U. S., 1948, 338 U.S. 1, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765, where the majority of the Court gave their express sanction to the compensation allowed for the damage caused to laundry machinery and equipment. The government was not contesting this portion of the condemnee's claim, but the Court states:

"* * * we think it appropriate to point out that we find it justified on the theory that such indemnity would be payable by an ordinary lessee, though not fixed in advance as part of his rent because not then capable of determination."

The factual similarity between temporary taking and the landlord tenant relationship is obvious. There is propriety therefore in consulting the rights and obligations created in the landlord tenant relationship by way of analogy in determining the obligations incurred by the United States in a temporary taking. But so far as the tenant's obligation is fashioned from the contractual relationship which he willingly assumes with the lessor, there is danger in the analogy because there are no consensual implications to be drawn from the exercise of the sovereign power of eminent domain. When a contract is breached, the promisee is entitled to be put in as good a position as he would have been had the promise been performed. From this, many courts have held that when a tenant breaches his covenant to restore the premises, he must pay to the lessor the costs of restoration. Willoughby v. Atkinson Furnishing Co., 1899, 93 Me. 185, 44 A. 612; Appleton v. Marx, 1908, 191 N.Y. 81, 83 N.E. 563, 16 L.R.A.,N.S., 210; Storr v. Keljik, 1929, 178 Minn. 391, 227 N.W. 211; Reinheimer v. Mays, 1930, 75 Okl. 131, 182 P. 230. Cf. United States v. Certain Parcels of Land in City of Baltimore, D.C.Md.1944, 55 F.Supp. 257, where the lessee of the premises had made substantial alterations under the terms of the lease, but had an obligation to restore at the end of the term. The government then condemned the use and

occupancy of the premises, and under the assumption that the lessor thereby lost his contractual right to compel the lessee to restore, the court held that the damages to the lessor included the reasonable cost of restoration.

Some courts, however, have refused to hold that the tenant has an immutable duty to pay the costs of restoration, holding that where those costs exceed the diminution in market value caused to the premises, the lessor can only recover the latter.

In Crystal Concrete Corp. v. Town of Braintree, 1941, 309 Mass. 463, 35 N.E. 2d 672, the court was of the opinion that the lessor ought not, by the rule of damages, be put in a better position than he would have been had the lessee performed the terms of the lease, and held that where the cost of restoration greatly exceeded the diminution in market value, the more reasonable, practical, and economical way of dealing with the property was to award diminution in market value. In Fuselier v. U. S., D.C.La.1953, 111 F. Supp. 471, the government leased some rice farming land for military use and left thereon some cement embankments, and the lessor sued for the cost of removal. Observing that the cost thereof would be $3,500, whereas the market value of the land only suffered to the extent of $600, the court held that the measure of damages would be that of diminution, or $600. The same measure was used in Henry H. Cross Co. v. Rice, 7 Cir., 1930, 45 F.2d 940, and in Georgia Kaolin Co. v. U. S., 5 Cir., 1954, 214 F.2d 284. The case of Realty Associates v. U. S., 1956, 138 F.Supp. 875, 877, 134 Ct.Cl. 167, is an excellent illustration of the unjust enrichment which would result if the lessor had an inflexible right to recover the costs of restoration. There the government, covenanting to restore the premises at the expiration of the lease, made several improvements to the property which substantially increased its value. Nevertheless the lessor sued upon the covenant to recover the costs of restoration. The Court of Claims said:

"To hold that in spite of the vast increase in the value of the property and the lack of damage caused by any action of the defendant, the plaintiff nevertheless is entitled to recover in addition to the mythical cost of restoring the property is inconceivable. To hold that the technical wording of the lease would justify an award of $220,000 or anything like that amount in damages which are practically nonexistent, runs counter to every tenet of justice and fair play which we have known from our youth up."

The reasoning of these cases is that despite the lessor's contractual right to restoration, he ought not, by an inflexible rule as to damages, recover more than that which he has actually suffered. This is in accord with the long established principle in the law of eminent domain that a landowner should not be compensated for more than that which has been taken from him. So far then, as the resemblance between the temporary taking and the landlord-tenant relationship warrants use of the landlord-tenant measure of damages in the case of the temporary taking, the Court is constrained to follow this latter line of cases, and hold that the government must pay only the diminution in market value when it is less than the costs of restoration.

The criteria which has long been held to measure just compensation is that the owner is entitled to be put in as good position pecuniarily as he would have occupied if his property had not been taken. United States v. New River Collieries, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. He is entitled to receive the value of what he has been deprived of and no more. To award him less would be unjust, to award him more would be unjust to the public. Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270. The owners here have simply failed to demonstrate that they have suffered any pecuniary deprivation. For them to demand that the public is obliged to pay them almost a half a mil-

444

lion dollars, which would presumably be used to re-install the medical-dental facilities, though their building continued to be as valuable as it was prior to the government taking, is to reimburse them for the particular values which they attach to the building. The Supreme Court, in Kimball Laundry Co., supra, 338 U.S. at page 5, 69 S.Ct. at page 1437, stated:

"The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."

The Court, therefore, concludes that there has been no diminution in the market value of the property by reason of the taking and use made by the government, and that the defendants have not been damaged so as to require a further payment of money by the government in addition to the reasonable rental value heretofore agreed upon by the parties and paid by the government.

During the trial several objections and motions to strike were made by both parties to the reception of evidence to which ruling was reserved. All objections are overruled and all motions to strike are denied.

Counsel for plaintiff are directed to prepare and present findings, conclusions and a judgment in accordance herewith.