James **FLOOD** and Mary Emma Stebbens, as Trustees of the Trust created by Paragraph III of the Last Will of James L. Flood, deceased, Appellants,

v.

**UNITED STATES of America,** Appellee.

No. 16224.

United States Court of Appeals Ninth Circuit.

Jan. 25, 1960.

339 P.2d 577; Moniz v. Bettencourt, 24 Cal.App.2d 718, 76 P.2d 535; Linde v. Emmick, 16 Cal.App.2d 676, 61 P.2d 338.

Chickering & Gregory, Frederick M. Fisk, John P. Macmeeken, Walter C. Fox, Jr., San Francisco, Cal., for appellants.

Perry W. Morton, Asst. Atty. Gen., S. Billingsley Hill, Roger P. Marquis, Attys., Dept. of Justice, Washington, D. C., Lynn J. Gillard, U. S. Atty., J. Harold Weise, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, POPE and MAGRUDER, Circuit Judges.

MAGRUDER, Circuit Judge.

In this case we have to determine what is "just compensation" within the meaning of the Federal Constitution. Following its modern practice, the United States condemned here only a term for years. This practice has introduced many perplexities, some of which were dealt with by the Supreme Court in Unit-ed States v. Westinghouse Electric & Mfg. Co., 1950, 339 U.S. 261, 70 S.Ct. 644, 94 L.Ed. 816. See the dissenting opinion in the court below, 1 Cir., 1948, 170 F.2d 752, 756.

It is worth while to observe that the obligation of the United States is imposed only by the general provision of Amendment V to the Constitution, " * * nor shall private property be taken for public use, without just compensation." The courts, and ultimately of course the Supreme Court of the United States, have to pour some specific meaning into this phrase "just compensation" as they pinprick out the cases one by one. The Constitution does not say that the United States must pay the reasonable "market value" of that which it takes. Sometimes market value, and no more, is not deemed to be a "just compensation". The Supreme Court, instead of reducing "just compensation" to a pat formula, has adopted practical standards and "has refused to make a fetish even of market value, since that may not be the best measure of value in some cases." United States v. Cors, 1949, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392. As Frankfurter, J., said, concurring, in United States v. Toronto, Hamilton & Buffalo Navigation Co., 1949, 338 U.S. 396, 408, 70 S.Ct. 217, 224, 94 L.Ed. 195, "experience counsels empiricism in dealing with these problems. And empiricism suggests sailing as close to the record of a particular case as possible. Only thus shall we avoid abstract pronouncements bound to distort or to be distorted by the case-by-case adjudicatory process especially appropriate in problems of this nature. Either lip-service will be paid such formulas while decisions are rooted in considerations outside them, or formulas not fitting practical circumstances will achieve impractical results."

Appellants herein are the owners of an office building, called the Flood Building, on Market Street in San Francisco, California. At one time the offices of the top floors had been rented almost exclusively to medical and dental tenants. The floors below contained many commercial ten-

ants, including drug stores, laboratories, and other activities associated with the medical and dental professions. Appellants, however, had moved out the various tenants in the building prior to the effective date of a lease of the Flood Building to F. W. Woolworth Company. The lease contemplated the destruction of the building and the erection of a new one by the tenant.

At this point the United States decided that it needed the building for general office space. On January 29, 1951, it filed in the United States District Court for the Northern District of California, Southern Division, a complaint for condemnation of an interest in the upper floors of the building. What the United States condemned was "the right to use and occupy said premises for a term of years commencing July 1, 1951, and ending June 30, 1952, extendible for yearly periods thereafter until June 30, 1956, at the election of the United States, notice of which election shall be filed in the proceeding at least thirty (30) days prior to the end of the term taken or subsequent extensions thereof, together with the right to remove within a reasonable time after the expiration of the term or extension thereof any and all improvements and structures placed therein by or for the United States." The declared purpose of the taking was that the United States was proposing to use the premises "in connection with housing of Federal agencies in the City and County of San Francisco".

The United States, having been let into immediate possession, proceeded, properly enough, to make extensive alterations of the premises so as to render the same suitable for general office use. It removed certain partitions, sinks, workbenches, cabinets, etc. It terminated the exposed piping and electric wiring at the main walls, and it did necessary plastering and repainting and installed certain new fixtures such as radiators, electrical fixtures, and asphalt tiles. The net result of the government's alterations was to convert into large offices what formerly had been medical or dental suites.

Having twice exercised its option to renew the lease, the United States ultimately surrendered possession of the premises on June 30, 1954. It elected to return the building as it then was, without incurring the expense of restoring it to the condition in which it was at the time of taking. There is evidence in the record as to what it would have cost the government to restore the building so as to render it again suitable for rental to medical and dental tenants; also, how long such work would have taken. The district judge in the view he took of the case found it unnecessary to resolve the conflicting evidence on this score, D.C., 157 F.Supp. 438.

On October 21, 1954, the district court entered a so-called "Final Judgment" which decreed the rental the United States would have to pay, pursuant to its obligation to make "just compensation" from the date of the taking to the final relinquishment of the building on June 30, 1954. These amounts for annual rental have been accepted by the owners, and there is no present dispute about this feature of the case.

But the parties were unable to agree upon what the United States should pay, if anything, because of its having turned back the building in a condition different from what it was at the time of taking. Accordingly, the "Final Judgment" of October 21, 1954, reserved jurisdiction in the district court to "determine the amount of compensation, if any, which the said defendants shall be allowed by reason of the failure of the United States to restore the premises hereinabove described to the condition in which they were at the time of the taking, ordinary wear and tear excepted."

At a subsequent date a hearing was held on the reserved point, and on June 10, 1958, the district court entered a second so-called "Final Judgment" determining that appellants were entitled to no further compensation on account of the failure of the United States to restore the premises to the condition in which

they were at the time of taking. The present appeal is from this judgment of June 10, 1958, appellants contending that the district court was in error in not allowing as additional compensation a sum of money equal to the cost of such restoration, together with a reasonable additional rental for the period which would be required to make the restoration.

The district court, upon adequate evidence, made the following findings of fact:

"IX.

"When plaintiff took possession of the building on February 1, 1951, it did not disrupt a going medical-dental operation, since defendants had themselves theretofore caused all the medical and dental tenants, and all other tenants, in the building to vacate.

"X.

"Upon resuming possession of said Flood Building on July 1, 1954, defendants embarked on a campaign to rent space in said building for multiple general office purposes as distinct from medical-dental. This campaign was singularly effective, for by January, 1956, the office space in the building was ninety to ninety-five percent occupied by general office tenants. No effort whatever was made by defendants to secure medical-dental tenants.

"XI.

"The net return before insurance and depreciation, for the third through the twelfth floors of said Flood Building, as of January, 1956, for its then use of general office occupancy was $1.55 to $1.60 per square foot per year, or approximately $85,000 greater than the net return of $1.05 per square foot per year, for the second through the twelfth floors, for the best year of the Flood Building's history, while operated as a medical-dental building.

"XII.

"In 1951, and for some years before, the Flood Building had ceased to be competitive in the medical-dental tenancy field, with the new and modern medical-dental office buildings in San Francisco, which were especially designed for use by physicians and dentists, such as the Fitzhugh Building, and the 490 Post Street Building and the 450 Sutter Street Building.

"XIII.

"At the time possession of the Flood Building was turned back to defendants on June 30, 1954, the condition set forth in Paragraph XII continued to exist, and was, if anything, aggravated by a considerable movement during the years 1953 and 1954 of tenants from medical buildings in downtown San Francisco to outlying and suburban areas.

"XIV.

"The three hundred or more medical and dental tenants which defendants caused to vacate the Flood Building in 1950 and 1951, had re-established themselves in other buildings in downtown San Francisco and outlying suburban areas, in most instances at great expense to themselves, before June 30, 1954, and that prospective market was lost forever to defendants.

"XV.

"The highest and best use of the Flood Building, as of the date of its return to defendants, namely, June 30, 1954, was no longer for medical and dental tenancies, but rather for multiple general office usage.

\*   \*   \*   \*   \*   \*

"XVII.

"The Flood Building suffered no diminution in market value by reason of the plaintiff's taking, or the changes made by the Government during its occupation. The fair market value of the building when

returned on June 30, 1954, was as great as it would have been had it been returned on that date in the condition in which it was taken in 1951."

The court concluded that the United States was under an obligation to return the building to the condition in which it was at the time of taking, reasonable wear and tear excepted, and it conceded that the government had broken this obligation. But the court went on to point out that the obligation to restore, in the present circumstances, is not a contractual obligation such as may be voluntarily assumed by a private tenant, but is an obligation resting upon the United States solely in its capacity as a condemnor of the term for years. It determined that the United States owed no further "just compensation" because the measure of damages for the breach of its obligation to restore must be the diminution of the market value of the premises as of the date of its return, when that sum is less than the cost of restoration. The court found that there had been no diminution in the value of the building by reason of the government's alterations; in fact, that such value was really enhanced by what the government had done. We suspect that appellants would indeed have been chagrined had the United States elected to incur the expense of making the aforesaid restoration.

We agree with the district court that the owners were not entitled to recover the restoration costs under the circumstances stated. As the Supreme Court said in United States v. Miller, 1943, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336: "The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." We know of no case which holds to the contrary, certainly none in the Supreme Court. To allow such a recovery here would put the owners in a better pecuniary position. In support of the district court's conclusion, see Realty Associates, Inc. v. United States, 1956, 138 F.Supp. 875, 134 Ct.Cl. 167. See also Comment, 33 N.Y.U.L.Rev. 882 et seq. (1958).

Appellants have not briefed or argued to us any possible liability of the United States for the salvage value of the fixtures taken by the government incidental to its alteration of the premises. Cf. United States v. General Motors Corp., 1945, 323 U.S. 373, 384, 65 S.Ct. 357, 89 L.Ed. 311. Therefore we say nothing in this opinion about that aspect of the case.

A judgment will be entered affirming the judgment of the District Court.