THE PEOPLE OF PUERTO RICO, ETC., Plaintiff, Appellant and Appellee, *v.* LA SOCIEDAD McCORMICK, ALCAIDE & Co., S. EN C., ETC., Defendants, Appellees and Appellants; FLOOR COVERINGS COMPANY OF PUERTO RICO, Intervener, Appellee and Appellant.

No. 10633. Argued March 1, 1955.—Decided February 29, 1956.

.J. B. *Fernández Badillo, Acting Attorney General,* and *Clemente Pérez Martínez* for appellant-appellee. *Luis Blanco Lugo* and *Carlos J. Torres* for appellees-appellants Sociedad Mc-Cormick, Alcaide & Co., S. en C., and spouses Torres-Alcaide. *Martín Travieso* for intervener, appellee-appellant.

Mr. Chief Justice Snyder delivered the opinion of the Court.

On April 19, 1950 the People of Puerto Rico filed a suit in the former Condemnation Court condemning the dominion title to a parcel of land and a building located thereon which belonged to Carlos J. Torres and his wife, hereinafter referred to as Torres. At that time the property was occupied by Floor Coverings Company of Puerto Rico, Inc., hereinafter referred to as Floor Coverings, under a five-year lease executed in 1946.[1] The lease was not recorded in the Registry of Property and Floor Coverings was not joined as a defendant.

---

[1] Torres had leased the property to McCormick, Alcaide & Co., S. en C., a *sociedad* owned and controlled by Torres. The *sociedad* in turn subleased it to Floor Coverings. However, in view of the identity of interest between Torres and the *sociedad,* we follow the lead of the parties and the trial court in characterizing Torres as the lessor and Floor Coverings as the lessee, for purposes of this case.

On August 7, 1950 Torres filed a motion for delivery to him of the sums deposited by the People—$1,528.52 and $17,747.50—as compensation for the land and building, respectively. The People did not object to this motion. It was granted and the money was delivered to Torres on August 9, 1950.

On August 15, 1950, after receiving permission of the trial court to intervene, Floor Coverings filed an answer praying among other things for the market value of its lease and damages for moving its machinery. Torres, after having been notified with an amended answer which Floor Coverings filed on August 25, 1950, filed a motion of September 7, 1950 agreeing that the sums deposited by the People and withdrawn by Torres were the market value of the condemned land and building and consenting to a judgment to that effect.

Floor Coverings was permitted to file a second amended answer on January 17, 1951. Torres was also allowed to file an amended answer on January 26, 1951 stating that he accepted that the sums withdrawn by him were the fair market value of the lot and building, but asking the court to hold that these sums belonged exclusively to him and did not include any damages to which Floor Coverings, the lessee, might be entitled.[2]

After a trial on the merits, the lower court entered a

---

[2] On January 31, 1951, a few days after the trial had begun, Torres moved for permission to file a second amended answer. The motion recited that he had consented to a judgment fixing the sums deposited as the market value of the condemned property under the impression that these sums did not include any damages due to Floor Coverings. The proposed second amended answer alleged that "the total value" of the property was $29,680.75 and prayed that the People be ordered to deposit the additional sum of $10,405, which was exactly the sum claimed by Floor Coverings in its second amended answer. The trial court never granted Torres permission to file this proposed second amended answer. And at the trial Torres abandoned the theory advanced therein that any money due Floor Coverings must be paid by the People. On the contrary, although Torres contended that Floor Coverings had suffered no damages, he repeatedly conceded at the trial that if any money was due Floor Coverings, it must come out of the deposit withdrawn by Torres.

judgment in favor of Floor Coverings against the People for $4,000 as compensation for the loss of the lease. The People, Torres, and Floor Coverings all appealed from this judgment.

## I

In its appeal the government argues that Torres rather than it is liable for any damages to which Floor Coverings might be entitled for losing its lease. Briefly stated, the People's thesis is as follows: It condemned the dominion title, not the various interests of particular defendants. Torres conceded both in his pleadings and at the trial that the deposit constituted the market value of the property. As Torres withdrew the entire deposit, the compensation, if any, to Floor Coverings for losing its lease must be paid by Torres out of the deposit withdrawn by him.

The trial court was apparently of the view that not only was Torres entitled to the full value of the dominion title but that Floor Coverings was also entitled to an additional sum for the value of its lease. We cannot agree. "A condemnation suit is a proceeding *in rem*. It is directed not against particular defendants, but against the property itself. Although the exercise of the power of eminent domain extinguishes all previous rights in the property, the government does not condemn the interest therein of a particular defendant." *People* v. *632 Sq. Mts. of Land*, 74 P.R.R. 897, 905. The award of the court stands in the place of the real property and the owners of each interest therein recover out of the award the same proportional interest they had in the condemned property. *People* v. *Registrar*, 64 P.R.R. 125, 133. The fact that the dominion title to condemned property is subject to a lease ordinarily has no effect on the compensation the government must pay for the dominion title. The value of the dominion title is determined and then the value of the leasehold is deducted therefrom. . . . "The value of the lessees' term for years was part of the value of the fee itself, and any separate allowance for them was ob-

vious duplication, so far as concerns the [government]."
Judge Learned Hand in *United States* v. *City of New York*,
165 F.2d 526, 530 (C.A 2, 1948); *United States* v. *25.936
Acres of Land, etc.,* 153 F.2d 277, 279 (C.A. 3, 1946). To
the extent the lease impairs the value of the dominion title,
the lessee must be compensated out of the amount which
represents the full value of the dominion title, and not in
addition thereto. *Silberman* v. *United States,* 131 F.2d 715
(C.A.1, 1942); *State, By and Through State Highway Com'n*
v. *Burk,* 265 P.2d 783, 800–2 (Ore., 1954); *United States* v.
*Honolulu Plantation Co.,* 182 F.2d 172 (C.A.9, 1950);
*Meadows* v. *United States,* 144 F.2d 751 (C.A. 4, 1944);
*Eagle Lake Improvement Co.* v. *United States,* 160 F.2d 182
(C.A. 5, 1947); *Bogart* v. *United States,* 169 F.2d 210, 213
(C.A. 10, 1948); *United States* v. *53¼ Acres of Land,* 176
F.2d 255 (C.A. 2, 1949); *Mayor, etc., of Baltimore* v. *Gamse
& Bro.,* 104 Atl. 429 (Md., 1918); 1 Orgel, on *Valuation Under Eminent Domain,* 2nd ed., pp. 461–3, 483; 4 Nichols, on
*Eminent Domain,* 3rd ed., pp. 162, 171–3; 2 *id.,* pp. 36–9,
51; Annotation, 166 A.L.R. 1211.[3]

 "Provided the government makes a reasonable
effort to join as defendants all persons who may have an interest in the condemned property, the government has no interest as such in the distribution of the compensation paid

---

[3] 4 Nichols, *supra, p.* 163 asserts that "...in exceptional cases, where
the aggregate value of the separate interests is in excess of the unencumbered fee value, such interests may be separately evaluated", citing
*Mayor, etc., of City of Baltimore* v. *Latrobe,* 61 Atl. 203 (Md., 1905), and
also referring to *City of St. Louis* v. *Rossi,* 64 S.W. 2d 600 (Mo., 1933).
To the same effect, 1 Orgel, *supra,* pp. 461–3,470, *et seq.* But such cases
involve peculiar facts. None of them are cases where as here we have
an ordinary fixed-term lease from the owner of the dominion title. The
only special circumstances here—the procedural snarl which arose because
the People improperly failed to join the lessee and because Torres first
espoused but finally retracted the theory that compensation for the lease
must be awarded to Floor Coverings in addition to the compensation to
Torres for the full value of the dominion title—could not affect the value
of the interests taken from the respective parties. We therefore need not
pass on the question of whether such an exceptional case could ever occur
in this jurisdiction.

to the various claimants." *People* v. *632 Sq. Mts. of Land, supra*, pp. 905–6. The People did not make ". . .a reasonable effort to join as defendants all persons who may have an interest in the condemned property. . ." in this case. Although the lease was unrecorded, the government knew that Floor Coverings was in possession of the property and was operating a rug factory therein. It therefore erred in not joining Floor Coverings as a defendant and in consenting to the withdrawal of the entire deposit by Torres. If for some reason Floor Coverings were unable to collect from Torres any damages to which it is entitled for losing its lease, the government would be liable therefor. But as between Torres and the government, Torres must pay such damages to Floor Coverings, *provided the deposit constituted the market value of the dominion title*.

The trial court concluded that the deposit covered only Torres' interest in the dominion title and not Floor Coverings' leasehold interest because the People permitted Torres to withdraw the entire deposit knowing that the lease existed. But the fact that the People—whether through carelessness or ignorance of the law as to the rights of a person with an unrecorded lease—improperly permitted Torres to withdraw the deposit, which represented the full value of the property, plays no role on the issues of (1) the value of the dominion title and (2) the portion thereof to which Floor Coverings was entitled by virtue of its lease.[4]

---

[4] The complaint contains the following:

| "Persons With An Interest | Compensation |
|---|---|
| "a) Carlos J. Torres and his wife Estela Alcaide as owners of the parcel | $1, 528. 52 |
| "b) Carlos J. Torres and his wife Estela Alcaide as owners of certain structures and improvements located on the parcel | $17, 747. 50 |
| | $19, 276. 02" |

The government should have added Floor Coverings as a person with an interest in these sums. But the failure to do so does not change the fact that in substance the People, having condemned the dominion title, alleged that the latter was worth the amount deposited.

*Musanti* v. *State*, 131 N.Y.S. 20 (N.Y., 1911), relied on by the trial court, is not in point. The one-page opinion of the New York Court of Claims in that case merely holds that if the condemnor improperly pays the *full* value to the owner of the dominion title, it must also pay the tenant for his interest therein. We agree with this holding. As we have pointed out, if Floor Coverings is unable to recover from Torres, the People will be liable to Floor Coverings therefor. But the issue here is different: Is the government liable to a lessee *in addition* to its liability to the owner of the dominion title for the full value thereof? For the reasons stated, we answer this question in the negative.

■■ Section 2, par. 9 of the Organic Act, 48 U.S.C.A. § 737, 1 L.P.R.A., p. 54, which was in effect when this case arose, does not require a different result.[5] It is true that its provision for just compensation where property is "taken or *damaged*" by the government of Puerto Rico is broader than the terms of the Fifth Amendment of the United States Constitution. *People* v. *Soc. Agric. Mario Mercado e Hijos*, 72 P.R.R. 740, 746-7; *People* v. *García*, 66 P.R.R. 478, 484-6; 2 Nichols, *supra*, § 6.38 [3], pp. 296 *et seq.* But we know of no case or author expressing the view that a constitutional provision of compensation for damaging as well as taking property requires the government to pay the owner of the dominion title its full value and in addition to pay a fixed-term lessee for his interest. *Cf. U.S.* v. *General Motors Corp.*, 323 U.S. 373, 379-80, as quoted in footnote 23, *infra*.

There is nothing in our statutes which points to a contrary conclusion. We need not stop to determine the exact scope of the language of the third paragraph of § 282 of the 1930 Civil Code, as it was eliminated from § 282 by Act No. 300, Laws

---

[5] Exactly the same provision is found in § 9 of Article II of the Constitution of the Commonwealth of Puerto Rico: "Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law." I L.P.R.A. p. 181.

of Puerto Rico, 1946.[6] The measure of compensation in condemnation cases was not expanded by Act No. 105, Laws of Puerto Rico, 1948, amending § 4 of the Condemnation Act, 32 L.P.R.A. § 2905. Section 4, after stating that a condemnation proceeding shall be *in rem*, provides that "the complaint may be directed against the owners of the estate, the occupants thereof, and all other persons having a right or interest therein; or it may be directed against the property itself."[7] This provision is in accordance with our view that persons with an interest in the land and with a right to compensation are entitled to notice and a hearing on their claim. *People* v. *632 Sq. Mts. of Land, supra.* But Act No. 105 did not restore the third paragraph of § 282 of the 1930 Civil Code or modify § 282 in any way. Also, nothing contained in §§ 5(a) and (b) of the Condemnation Act as amended, 32 L.P.R.A. §§ 2907–8, leads to a different result.

---

[6] Section 282 of the Civil Code, 1930 ed., read:

"No person shall be deprived of his ownership, except it be by a competent authority and for a justified purpose of public utility, and after having been properly indemnified.

"If this requirement has not first been complied with, the district courts shall protect and, in proper cases, replace the owner in possession of the expropriated property.

"The indemnification shall comprise, not on the value of the thing whereof the owner is deprived, but also a compensation for any damages and injuries which may be caused him by the deprivation of property."

Section 282, as amended by Act No. 300 of 1946—31 L.P.R.A. § 1113 —now reads as follows:

"No person shall be deprived of his ownership except it be by a competent authority and for a justified purpose of public utility or social benefit, and upon payment of just compensation which shall be fixed in the manner provided by law."

[7] Section 4, as amended by Act No. 105 of 1948, reads in part as follows:

"Said proceedings shall be in rem, and the plaintiff may include in the same complaint, if deemed advisable, one or more properties, whether or not belonging to the same owner; *Provided,* That when the whole of a estate to be condemned is made up by the grouping of two or more properties or parcels of lands which, due to their abutting each other, constitute one single piece of property, whether or not belonging to the same owner, said property, the object of condemnation may, for all purposes of the proceedings, be described in the complaint as if it were one sole estate.

■ Section 1461 of the Civil Code, 1930 ed., 31 L.P.R.A. § 4068, plays no role in this case insofar as the nature and amount of compensation to the lessee, is concerned.[8] For reasons already stated, when the dominion title was condemned by the government in this case, the lessee became entitled to compensation for his leasehold interest even though the lease was not recorded in the Registry of Property...Section 1461 of the Civil Code enables the purchaser of real estate to terminate an unrecorded lease provided that the lessee "...be indemnified by the vendor for the losses and damages he may have suffered." We fail to see how § 1461 can be read as increasing the obligations of the government toward a person with an unrecorded lease. To so hold would be in effect to grant more damages to such a lessee than to one whose lease was recorded. Such an anomalous result is not required under the former Organic Act, our statutes relating to compensation or § 1461. The nature and amount of the compensation to a lessee in a condemnation case does not depend on whether or not the lease was recorded; he receives the same compensation in both cases.

■ At the trial Torres took exactly the position we have just stated. It is true that at one point in the case he adopted a different theory and moved for permission to file a

---

The complaint may be directed against the owners of the estate, the occupants thereof, and all other persons having a right or interest therein; or it may be directed against the property itself. In this latter case, the complaint shall recite, as far as it may be possible for the plaintiff to determine, the names of all persons who as owners, occupants, or holders of any right or interest in the estate, must be served with notice of the proceedings, to the end of any right they may have to the compensation fixed for the value of the condemned property, or to any damages that may arise from the proceedings."

[8] Section 1461 reads as follows:

"The purchaser of a leased estate has a right to terminate the lease in force at the time of making the sale, unless the contrary is stipulated, and the provisions of the Mortgage Law prevent.

"If the purchaser should make use of this right, the lessee may demand that he be permitted to gather the fruits of the crop corresponding to the current agricultural year and that he be indemnified by the vendor for the losses and damages he may have suffered."

second amended answer alleging that the sum deposited did not cover the entire value of the property. However, this motion was never granted and Torres abandoned it. See footnote 2. Instead, he reverted to his original theory and stated repeatedly throughout the trial (1) that the money deposited and withdrawn by him was proper compensation for the entire value of the property, and (2) that as he had withdrawn the deposit, he rather than the government must compensate Floor Coverings for the damages, if any, due to the early termination of its lease; but that in fact no such damages had been suffered by Floor Coverings.

All parties agree that Torres is solvent. In view of the position he took at the trial that the damages, if any, due Floor Coverings by virtue of the lease must be paid by him, the error of the government in failing to join Floor Coverings and in consenting to the withdrawal of the entire deposit by Torres loses its significance. See text prior to footnote 4. The only other responsibility of the government was to deposit the just compensation for the entire property. *People v. 632 Sq. Mts. of Land, supra.* Condemnees have the burden of proof to show that the deposit was not sufficient.[9] Torres did not meet that burden. On the contrary, he conceded that the amount deposited represented the market value of the entire property. It follows that whatever compensation Floor Coverings may be awarded for losing its lease must come from Torres—who is solvent and who withdrew the deposit—rather than by way of an additional deposit therefor by the government. The trial court erred in requiring the People rather than Torres to pay such damages to Floor Coverings.

---

[9] In a condemnation case on the issue of compensation "... (1) the defendant is in effect the plaintiff; (2) he must present his evidence first; and (3) he has the burden of proof as to value." *People v. 632 Sq. Mts. of Land, supra,* p. 911; *People v. Garcia, supra; Canino v. Court of Eminent Domain,* 70 P.R.R. 141; *U.S. ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 273–4; Dolan, *Present Day Court Practice in Condemnation Suits,* 31 Va.L.Rev. 9, 17; 5 Nichols, *supra,* p. 198.

## II

We turn to the question of the amount to which Floor Coverings is entitled because its lease was terminated by the condemnation proceeding. Generally speaking, where the entire balance of a leasehold is condemned, the lessee is entitled to "...the value of the use and occupancy of the leasehold for the remainder of the...term...less the agreed rent which the tenant would pay for such use and occupancy." *United States* v. *Petty Motor Co.*, 327 U.S. 372, 381; *United States* v. *Westinghouse Co.*, 339 U.S. 261.[10] Floor Coverings endeavoured to come within this rule. It presented Torres and José M. Canals, an expert, as witnesses on the issue of the market value of the lease. Torres fixed its value at $500 to $600 a month, whereas Canals set a figure of approximately $325 a month, in contrast with the contractual rate of $200 a month.

The trial court awarded $4,000 to Floor Coverings for the loss of its lease. Its findings on this point read as follows:

"...that what Floor Coverings Co. of P.R., Inc., was paying for rent of the building or buildings was not solely $200.00 a month but $200.00 a month and $4,176.66 in improvements for a term of five years, in accordance with the provisions of the contract. That is, an average monthly prorated expenditure of $269.60 per month. This Court gives credit to the testimony of Carlos J. Torres in his first appearance on the stand with respect to the rental value of the condemned property in the

---

[10] To the same effect, *Department of Public Works and Buildings* v. *Bohne*, 113, N.E. 2d 319, 324 (Ill., 1953); *United States* v. *Certain Lands, etc.*, 183 F.2d 320, 321 (C.A. 3, 1949); *United States* v. *425,031 Square Feet of Land, etc.*, 187 F. 2d 798 (C.A. 3, 1951); *United States* v. *Advertising Checking Bureau*, 204 F. 2d 770 (C.A. 7, 1953); Annotation, 3 A.L.R. 2d 286, 290; 4 Nichols, *supra*, pp. 175–7.

We held in *School Board of Carolina* v. *Saldaña et al.*, 14 P.R.R. 339, 359–64, that a lessee is entitled to compensation in a condemnation proceeding for the loss of his lease. However, insofar as the measure of damages is concerned as described on p. 360 of the *Saldaña* case, we note that the latter case was decided prior to the amendment of § 282 of the Civil Code as set forth in footnote 6. See also *American R.R. Co. of P.R.* v. *Quiñones*, 15 P.R.R. 1; *Veve* v. *Lloreda, District Judge*, 17 P.R.R. 536.

amount of $500.00 to $600.00 monthly. That, together with the testimony of the expert Canals and the lack of proof of the other parties as to the market value of the property on which to base the value of the intervenor's lease, moves us to conclude that the lease of Floor Coverings Co. of P.R., Inc, had a value of four thousand dollars ($4,000.00). We also state that 'market value method' is not the applicable method to evaluate in this case the value of the damage suffered by the lessee in losing its lease, but rather that of capitalization of the rent."

It is not entirely clear how the trial court arrived at the figure of $4,000.00. It found that the lease had 17 months to run.[10a] And it may have allowed 17 X $230.40, or approximately $3,915, since the sum of $230.40 is the difference between (a) the figure of $500 a month supplied by Torres in his original testimony as the market value of the lease and (b) the rent of $200 a month plus $69.60 per month paid by Floor Coverings for improvements and prorated over the five-year period of the lease. Under Canals' testimony the recovery would be considerably less. The trial court was of course not required to follow blindly the testimony of the expert witness. *People* v. *Soc. Agríc. Mario Mercado e Hijos*, *supra*, p. 762. But there must be some rational basis for the amount of its judgment. On this point we are confronted with several difficulties. First, as hereafter noted, Torres withdrew the foregoing figures in later testimony. See text prior to footnote 14. Second, we are unable to determine to what extent the trial court used "capitalization of rent" rather than "market value" to fix the value of the lease. Third, although the trial court awarded no moving costs as such, see Part III, it apparently took such costs into consideration in fixing the value of the lease, quoting with approval from *United States* v. *Petty Motor Co.*, 147 F.2d 912 (C.A.10, 1945). But the trial court overlooked the fact that this case had already been reversed by the Supreme Court. *United*

---

[10a] But see the text prior to footnote 18 as to the remaining period of the lease.

*States* v. *Petty Motor Co., supra.* Fifth, none of the parties discuss in their briefs how the trial court arrived at the figure of $4,000. However, we put all these questions aside. We cannot sustain the conclusion of the trial court as to this item because another principle comes into play in this case.

If a ceiling price is validly fixed by law for commodities which are thereafter condemned by the government, the owner is not entitled as just compensation to more than the ceiling price, in the absence of special circumstances establishing hardships peculiarly applicable to the owner. *United States* v. *Commodities Corp.*, 339 U.S. 121. The court points out at p. 124 that ". . . ceiling prices of commodities held for sale represented not only market value but in fact the only value that could be realized by most owners. Under these circumstances they cannot properly be ignored in deciding what is just compensation." The court added at p. 125: "We think the congressional purpose and the necessities of a wartime economy require that ceiling prices be accepted as the measure of just compensation, so far as that can be done consistently with the objectives of the Fifth Amendment."[11]

We need not determine what effect ceiling prices for rent under our Reasonable Rents Act as amended—17 L.P.R.A. §§ 181 *et seq.*—would have on the compensation to

---

[11] "Price and rent controls restrict the owners' freedom to deal with his property, but the losses that may occur because of such restriction are not compensable because there has been no 'taking'." Note, *Recent Constitutional Developments on Eminent Domain*, 4 Vand.L.Rev. 673, citing *Bowles* v. *Willingham*, 321 U.S. 503, 517 (rent control); *Yakkus* v. *United States*, 321 U.S. 414 (price control). See *United States* v. *Felin & Co.*, 334 U.S. 624; *Gladding, McBean & Co.* v. *United States*, 101 Fed.Supp. 358 (Ct. Cl., 1951); *Safeway Stores* v. *United States*, 93 F.Supp. 900 (Ct.Cl., 1950) cert. denied 341 U.S. 953; *Oro Fina Consolidated Mines* v. *United States*, 92 F.Supp. 1016 (Ct.Cl. 1950); Braucher, *Requisition at a Ceiling Price*, 64 Harv.L.Rev. 1103; Note, *OPA Ceiling Prices as Evidence of Value*, 60 Harv.L.Rev. 132; 65 Harv. L.Rev. 1061; Frank, *The United States Supreme Court: 1949–50*, 18 U.Chi.L.Rev. 1, 14–5; Note, Marcus, *The Taking and Destruction of Property under a Defense and War Program*, 27 Cornell L.Q. 476, 528; Note, *Determination of Just Compensation in a Controlled Market*, 17 U.Chi.L.Rev. 125; 1 Orgel, *supra*, 2d ed., pp. 122–32; 4 Nichols, *supra*, pp. 61–3; *id.*, 1954 Cum.Supp. p. 56.

which the owner of the dominion title of condemned real property would be entitled.[12] The issue here is the value not of dominion title but of a lease. Pursuant to the Reasonable Rents Act, a ceiling price of $200 a month was fixed for this lease. In the *Commodities* case the Supreme Court specifically rejected the theory that the owner is entitled, in addition to the ceiling price, to a "retention value"; *i. e.*, an allowance for the price the owner could have obtained if he had been permitted to hold the commodity until after price restrictions had been removed. But even if the contrary were the rule and retention value were allowed, there is nothing in the record to indicate that the ceiling price of $200 a month might be modified for the few remaining months of the unexpired lease in this case. Apart from the question of the effect of a ceiling price for rent on the market value of dominion title to real property, see footnote 12, the same rule laid down in the *Commodities* case for price control of food and merchandise applies to the value of the unexpired portion of a lease of real property which is under rent control. In *United States* v. *Delano Park Homes, supra*, it was held that, in determining the value of condemned land, the trial court properly took into consideration that the condemnee could not build thereon at that time because he would have been unable to obtain a priority for building materials during the war emergency. Judge Learned Hand said in the *Delano* case at p. 474: ". . . when competent authority has fixed prices at a maximum, or has denied owners some specific use of their property, it is patently a disregard of its authority, either indirectly to allow a higher price on condemnation, or to allow the price to be figured in disregard of the limitation imposed." See *United States* v. *Sanitary Dist.*, 149 F. 2d 951 (C.A. 7,

---

[12] Since the sales price of dominion title to real property is not controlled by our Reasonable Rents Act, the ceiling price affects to some extent, but does not control, the market value of the dominion title. See *United States* v. *Delano Park Homes*, 146 F.2d 473 (C.A. 2, 1944); *United States* v. *49,375 Square Feet of Land, etc.*, 92 F.Supp. 384, 393 (Dist.Ct., N.Y., 1950).

1945). *Cf. People* v. *Franceschi*, 72 P.R.R. 517,528–9. The value of the lease in this case therefore cannot be fixed at a higher rate than the ceiling price which was the same amount —$200 a month—as the contractual rate in the lease. Accordingly, there was no damage to Floor Coverings when it was deprived of the unexpired portion of its lease.

As already noted "...the ceiling price... should be accepted as the maximum measure of compensation unless [the owner] has sustained the burden of proving special conditions and hardships peculiarly applicable to it. *Cf. Marion & Rye Valley R. Co.* v. *United States*, 270 U.S. 280, 285." *United States* v. *Commodities Corp., supra*, p. 128. We find nothing in the record showing that Floor Coverings sustained the burden of proving such peculiar hardships as to except it from the general rule that the ceiling price is controlling. In fact, in its brief here Floor Coverings does not even discuss the effect of the ceiling price on its claim, despite the fact that this issue was presented and argued by Torres both in the trial court and in this Court.

The testimony of Torres does not show any exceptional hardship on Floor Coverings. He testified as a witness for the latter that the remaining portion of the lease was worth $500 or $600 a month. Later he was recalled to the stand by his own counsel and withdrew these figures because in his original testimony he failed to take into consideration (1) that a ceiling price of $200 a month for this lease had been fixed under the Reasonable Rents Act and (2) that the lease had only a short period to run.[13] We therefore agree with the statement which the lower court made several times at the trial that the latter testimony by Torres "killed" his original testimony as to the market value of the lease.[14] The

[13] A long unexpired lease has a greater market value than a comparatively short lease. *United States* v. *Certain Lands, etc., supra.*

[14] In view of these statements by the trial court, it is strange as heretofore noted to find the trial court basing its finding of fact as to the value of the lease on this testimony of Torres.

fact that he—and apparently Canals—failed to take the ceiling price into consideration deprived their testimony of any value on this question.

There was some testimony that it would be difficult and expensive for Floor Coverings to obtain another building reasonably accessible to workers trained in the manufacture of rugs. Apart from the fact that here again such testimony loses its validity because the witnesses ignored the possibility of rent control in estimating the price Floor Coverings would have to pay to rent another building for its factory, the problems of renting a satisfactory building for business purposes during a period of rent control were not unique to Floor Coverings. In addition, ordinarily the government is not required to pay for condemned property on the basis of ". . . a special value to the owner because of its adaptability to his needs . . ." *United States* v. *Cors*, 337 U.S. 325, 332; *U.S.* v. *General Motors, supra* p. 379; 4 Nichols, supra, pp. 12–13, 45. The government ". . . must pay only for what it takes and not for opportunities which the owner may lose as the result of the taking. . .". Dolan, *Consequential Damages in Federal Condemnation*, 35 Va.L.Rev. 1059. The test is the value of the condemned property, not what it might cost the condemnee to replace it in connection with a business previously established therein. 4 Nichols, *supra*, pp. 415–6.

A different question would be presented if the government fixed a ceiling price for some commodity or for rent of a particular piece of real estate in order to condemn it at that price. *United States* v. *Felin & Co., supra*, p. 646, concurring opinion of three Justices; Braucher, *supra*, p. 1110; Note, *Determination of Just Compensation in a Controlled Market*, 17 U.Chi.L.Rev. 125, 126; *United States* v. *Commodities, supra*, p. 141, dissenting opinion. But that did not occur here. Since as we have seen ordinarily a lessee is entitled only to the amount by which the market value of a lease exceeds the agreed rent, Floor Coverings—which could not under

the Reasonable Rents Act have transferred its lease at a rate higher than the contractual rental of $200 a month—is not entitled, except for the money it spent on improvements as presently noted, to any compensation for its lease.

The lease required Floor Coverings to reconstruct a barn to make it suitable for use as a rug factory in accordance with attached blueprints and specifications. Under the lease the landlord was to contribute $5,032.13 for the cost of these alterations, and any amount in excess thereof was to be paid by the lessee. This excess cost came to $4,176.66. In addition to paying the ceiling price of $200 a month as rent Floor Coverings was therefore required by the lease to make permanent improvements enhancing the value of the property which cost it $4,176.66. Ordinarily such improvements would be taken into consideration in compensating the lessee for the market value of the remaining period of his lease even where as here the permanent improvements would revert to the lessor on termination of the lease. *Department of Public Works and Buildings* v. *Bohne, supra,* 324; *United States* v. *425,031 Square Feet of Land, etc., supra,* 800; *Mayor etc., of Baltimore* v. *Gamse & Bro.,* 104 Atl. 429 (Md., 1918); Mc Cormick, *The Measure of Compensation in Eminent Domain,* 17 Minn.L.Rev. 461, 473, footnote 36. But as we have seen Floor Coverings is not entitled to compensation for loss of its lease as such in view of the ceiling price of $200 a month as rent for the property. Under these peculiar circumstances, since Floor Coverings was deprived of the use of the rug factory for the remaining period of the lease at the ceiling price of $200 per month, it was entitled to receive, out of the sum fixed as the value of the dominion title, the proportionate part of the said $4,176.66 corresponding to the unexpired period of the lease. Otherwise there would be a windfall to Torres who would have been required to permit Floor Coverings to use the property as improved by the latter at the ceiling price of $200 a month for the remaining period of the lease if the property had not been condemned. *Cf. Department of Public*

*Works and Buildings* v. *Bohne, supra; United States* v. *425,031 Square Feet of Land, etc., supra; Mayor, etc., of Baltimore* v. *Gamse & Bro., supra.*

In discussing the foregoing item, Floor Coverings argues that it is entitled to $1,183.37. It arrives at this figure by dividing $4,176.66—the sum it contributed toward the improvements—by 60 months, the life of the lease, obtaining thereby a monthly figure of $69.61. It then multiplies $69.61 by 17, in view of its theory that the remaining period of the lease was 17 months, giving it the figure of $1,183.37.

We accept the monthly figure of $69.61 [15] But we cannot agree that Floor Coverings was entitled to that sum for 17 months. Floor Coverings argues (1) that the lease provided that the five-year period began to run when the improvements were finished, and (2) that since the improvements were finished on September 19, 1946 and the property was condemned on April 19, 1950, the unexpired portion of the lease was 17 months.[16] The difficulty with this contention is that the lease provides that it was to begin to run when Floor Coverings started to reconstruct the building, with a proviso that the rent shall be $100 a month until the improve-

---

[15] Floor Coverings might have conceivably argued that a shorter period than 60 months—i.e., from the termination of the improvements until the end of the lease—should be used as the divisor, which would give it a monthly figure slightly higher than $69.61. But Floor Coverings does not make this argument. And the record is silent as to the exact date when Floor Coverings began to enjoy all or part of the improvements. We therefore follow Floor Coverings in using the period of 60 months *in amortizing* Floor Coverings' contribution to the improvements.

[16] Even if Floor Coverings were correct in contending that the lease provided that the five years began to run on the date the improvements were completed, the record is not clear as to when that occurred. Floor Coverings offered testimony fixing September 19, 1946. But Floor Coverings began to pay rent at the rate of $200 a month on July 7, 1946. The lease provided that the rent shall be $100 a month until the improvements are completed and $200 a month thereafter. See footnote 17. *Quaere,* even under Floor Coverings' theory whether the five years began to run on July 7, 1946 rather than on September 19, 1946.

ments were completed and $200 a month thereafter.[17] Under these terms of the lease Floor Coverings paid $100 a month as rent for two months, beginning on May 7, 1946, and $200 a month thereafter. The five-year period therefore began to run on May 7, 1946. Floor Coverings was permitted by the government to remain in possession of the property and to operate its rug factory therein until the end of the first week of August, 1950. Consequently, it used the property for 4 years and 3 months, and the unexpired portion of the lease was 9 months. Accordingly, Floor Coverings was entitled to $69.61 x 9, or $626.49.[18]

### III

 Floor Coverings appealed from the judgment insofar as it failed to compensate Floor Coverings for (1) moving costs, dismounting its equipment, and remounting it in another building, and (2) the loss of business during the two weeks it took Floor Coverings to move its rug factory.[19] We find no error in these rulings of the trial court.

---

[17] The second paragraph of the lease, executed on April 30, 1946, provides that it shall run "...for the term of five years to begin at the date stated on paragraph twenty-fifth."

The twenty-fifth paragraph reads as follows: "From the day the sublessee shall start the alteration and reconstruction of the barn and until the date of its termination, the monthly rental to be paid will be One Hundred Dollars ($100.00); upon termination of the alterations the rental will be Two Hundred Dollars ($200.00) per month as above stipulated.

"Being it understood that the work to be undertaken in order to start the alteration shall start not later than thirty days from the signing of this deed."

[18] For the reasons stated in the opinion, we are unable to agree with the finding of the trial court that the improvements should be calculated on the basis of 17 months. In any event, the trial court did not make a separate award for this item. Instead, as we have seen, the trial court added $69.60 per month to the rent of $200 a month and then, comparing the figure of $269.60 per month to the alleged market value of $500 a month, awarded Floor Coverings $4,000 for the loss of the lease. See text preceding footnote 10a and footnote 19.

[19] Floor Coverings also assigned as an error the failure of the trial court to allow it a proportionate part of the cost of the permanent improvements made by it, corresponding to the unexpired period of the lease. We passed on this point in Part II. See footnote 18.

Where the government condemns only part of the unexpired term of a lease, moving costs and other related items are taken into consideration in determining just compensation for the condemnee. *U. S.* v. *General Motors Corp., supra.* But where as here the dominion title—which includes the remaining portion of the lease—is taken, the lessee is not entitled to compensation for such moving costs or for the loss of business while he is moving. *United States* v. *Westinghouse, supra; United States* v. *Petty Motor Co., supra.* The reason for taking such items into consideration in the former case and rejecting them in the latter is as follows: "There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease which is not taken rests upon the lessee. This was brought out in the *General Motors* decision. Because of that continuing obligation in all takings of *temporary* occupancy of leaseholds, the value of the rights of the lessee which are taken may be affected by evidence of the cost of temporary removal." *United States* v. *Petty Motor Co., supra,* pp. 379–80 (Italics ours).[20]

In disallowing moving costs and loss of profits as compensable damages where an entire leasehold is taken, the court said in the *Petty Motor* case at pp. 377–9:

"The Constitution and the statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so called 'market value.' It is recognized that an owner often receives less than the value

---

[20] Even where such items as moving costs are taken into consideration, because only a part of the unexpired term of the lease is condemned, they are not allowed as independent items but only as elements to be considered in arriving at the market value of the lease for the period it is taken by the government. *United States* v. *General Motors Corp., supra,* p. 383; *United States* v. *Westinghouse, supra,* pp. 263–4.

of the property to him but experience has shown that the rule is reasonably satisfactory. Since 'market value' does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, damages to good will, the expenses of relocation and other such consequential losses are refused in federal condemnation proceedings. *Mitchell* v. *United States,* 267 U.S. 341, 344; *United States ex rel. T. V. A.* v. *Powelson,* 319 U.S. 266, 281; *Potomac Electric Power Co.* v. *United States,* 66 App. D. C. 77, 85 F. 2d 243; Orgel, Valuation under Eminent Domain, chap. V. For the purposes of these cases, it is immaterial whether the Government actually took the leaseholds of the tenants in addition to taking the temporary use of the fee or only destroyed the tenants' right of occupancy. If any property is taken, compensation is required. Cf. *United States* v. *Welch,* 217 U. S. 333.

"There was a complete taking of the entire interest of the tenants in the property. It has been urged that to measure just compensation for the taking of a leasehold by its value on the market or by the difference between a fair rental as of the time of taking and the agreed rent, is unfair. It is said the unfairness comes from the fact that there is really no market for leaseholds; that their value is something peculiarly personal to the lessee. The same thing is true as to incidental and consequential damages to the owner of a fee. We think the sounder rule under the federal statutes is to treat the condemnation of all interests in a leasehold like the condemnation of all interests in the fee. In neither situation should evidence of the cost of removal or relocation be admitted. Such costs are apart from the value of the thing taken. They are personal to the lessee. *The lessee would have to move at the end of his term unless the lease was renewed.*[21] The compensation for the value of his leasehold covers the loss from the premature termination except in the unusual situation where there is a higher cost for present relocation than for a future." (Italics ours.)[22]

---

[21] The trial court, in refusing to grant moving costs to the lessee in our case, pointed out that such costs "...are the same which normally and inevitably it would have had at the termination of the contract."

[22] To the same effect, 18 U. Chi. L. Rev. 349, 352; 4 Nichols, *supra,* p. 272; McCormick, *supra,* 476–8; *Minsk* v. *Fulton County,* 64 S. E. 2d 336 (Ga., 1951); *United States* v. *40,379 Square Feet of Land, etc.,* 58 F. Supp. 246 (Dist. Ct., Mass., 1944); *Mayor, etc., of Baltimore* v. *Gamse & Bro., supra.*

The provision in our Organic Act of compensation for property "taken or damaged" by the government of Puerto Rico is broader than the terms of the Fifth Amendment of the United States Constitution. See Part I. But even under our constitutional requirement there must be damage to the land itself or to property rights therein; interference with the business conducted on the land, loss of business during the moving period, moving expenses, and cost of reinstallation of equipment are not compensable. *People* v. *Soc. Agric. Mario Mercado e Hijos, supra,* p. 748; *Springfield Southwestern Ry. Co.* v. *Schweitzer,* 158 S. W. 1058 (Mo. 1913); 2 Nichols, *supra,* pp. 348–9, citing *Louisiana Highway Commission* v. *Boudreaux,* 139 So. 521 (La., 1932); Annotation, 3 A.L.R. 2d 286, 312, 318–9; *Developments in the Law—Damages,* 61 Harv. L. Rev. 113, 178; *United States* v. *General Motors Corp., supra.* In the latter case the Supreme Court made it clear that ordinarily where as here the dominion title to the property is taken, such items as moving expenses, costs for reinstallation of equipment, and loss of business are not compensable even under a constitutional mandate like ours which requires compensation for property "taken or damaged".[23]

[23] In the *General Motors Corp.* case, the court said at pp. 379–80: "The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government. We are not to be taken as departing from the rule they have laid down, which we think sound. *Even where state constitutions command that compensation be made for property 'taken or damage' for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage.*" (Italics ours.) The court cites Orgel, *supra,* 1st ed., Chap. V, p. 253 in support of this statement.

For the reasons stated in Part I, compensation is not required under our Civil Code and Condemnation Act for moving costs and loss of business. Although we allowed moving expenses under the circumstances involved in *People v. Soc. Agric. Mario Mercado e Hijos, supra,* that case is distinguishable.[21] To hold otherwise would be to require compensation for every person occupying condemned property—whether he be the owner of the dominion title or a lessee thereof—for his general moving expenses. Our constitutional requirement of compensation for property taken or damaged—although broader than the Federal provision which is confined to compensation for property taken—does not include such expenses.

## IV

In his appeal Torres assigns as the only error the holding of the trial court that the lease was terminated on April 19, 1950 by the condemnation proceeding. The People condemned the land and building in which the rug factory was located but did not condemn the adjacent dwelling and lot which were also covered by the lease. Torres argues that after the condemnation Floor Coverings remained liable for either the entire amount of the rent—or at least the proportionate part corresponding to the dwelling—for the remaining period of the lease.

We need not determine whether we would hold that all —or only the proportionate—part of the rent need be paid

---

[21] In the *Mario Mercado* case we said that (p. 747) "...*when the improvement is attached to the condemned realty,* compensation must be granted to cover the costs of removal, under the theory of a partial taking." (Italic ours.) In that case we held that certain machinery formed part of the realty because (pp. 747–8) "...the machinery could not be removed from the condemned building unless the latter were torn down...". Floor Coverings does not argue in its brief in this Court that it is entitled to moving costs because its machinery was attached to the realty. This portion of the *Mario Mercado* case is therefore not applicable here. Cf. *United States v. Becktold Co.,* 129 F.2d 473 (C.A. 8, 1942); *Potomac Electric Power Co. v. United States,* 85 F.2d 243 (C.A., D.C., 1936); *In Re Gratiot Ave., City of Detroit,* 293 N.W. 755 (Mich., 1940); Annotations, 156 A.L.R. 397, 34 A.L.R. 1523.

where a lease remains in effect after dominion title to real property has been condemned. Cf. Annotations, 163 A.L.R. 679, 43 A.L.R. 1176; Note, *Lease Frustration by Eminent Domain*, 40 Ill.L.Rev. 558; McCormick, *supra*, 473, footnote 36; *John Hancock Mut. Life Ins. Co. v. United States*, 155 F.2d 977 (C.A. 1, 1946), cert. denied, 329 U.S. 774. We put this question aside as we agree with the trial court that in this case the lease did not remain in effect under our Civil Code after the main building and the land on which it was located were condemned. When the purpose for which a lease was executed is destroyed by a condemnation proceeding, the lease is terminated and the lessee is no longer liable to the landlord for the rent. Section 1458 Civil Code, 1930 ed., 31 L.P.R.A. § 4065. See Note, *supra*, 40 Ill.L.Rev. 558, 559–61, and cases cited; 31 Calif.L.Rev. 338 and 445; Annotation, 3 A.L.R.2d 286, 298. The lease between Torres and Floor Coverings shows on its face that its principal, if not sole, purpose was to operate a rug factory in the barn which was to be reconstructed by Floor Coverings. The small dwelling which happened to be located there was merely incidental thereto. The lease contract was therefore frustrated by the action of the government in condemning the main building and the land on which it was located. It follows that Floor Coverings could not be held liable to Torres under the lease for either the entire rent or for any proportionate part thereof.[25]

The remaining question arises from the fact that Torres collected "rent" at the rate of $200 a month from Floor Coverings for April, May, and June of 1950, despite the fact that the factory building and the land on which it was located belonged to the People from April 19, 1950. Torres concedes that the government is entitled to the major portion of this money for the use of its property. *People* v.

[25] We leave open the question of the liability of the lessee for rent—or a proportionate part thereof—where, contrary to the facts of this case, the condemnation of part of the leased property does not frustrate the principal purpose of the lease.

*Soc. Agríc. Mario Mercado e Hijos, supra; López v. District Court,* 67 P.R.R. 163, 165–6. However, since the dwelling continued to belong to Torres, the latter is entitled to a reasonable amount—which we fix at $35 a month—for its use by Floor Coverings this period.[26] Accordingly, we shall modify the judgment to require Torres to pay the People the sum of $385 for "rent" which was paid to Torres by Floor Coverings during the period when a reasonable sum for its use should have been paid to the government.[27] Torres in turn is entitled to retain the remaining portion of the "rent" paid to him by Floor Coverings for part of April, May, and June of 1950 for the use of the dwelling at the rate of $35 a month.

The judgment of the former Condemnation Court will be modified (1) by eliminating the provision that the People of Puerto Rico shall pay Floor Coverings $4,000 for the loss of its lease, (2) by requiring Torres to pay Floor Coverings $626.49 for the loss of the said lease, and (3) by directing Torres to pay $385 to the People from the "rent" collected by Torres from Floor Coverings after title to the property was vested in the People.[28]

Mr. Justice Negrón Fernández did not participate herein.

---

[26] The testimony was conflicting as to this item. The estimates ranged from $15 to $50 a month. The trial court did not resolve this conflict. Ordinarily we would send the case back to the trial court for a finding of fact on this question. *People v. Soc. Agric. Mario Mercado e Hijos, supra,* p. 755. But in view of the desirability of terminating this prolonged litigation, we have weighed the evidence on this point and have fixed the proportionate value of the dwelling during the period in question at $35 a month.

[27] The government is entitled to the sum of $165 a month—the sum we have allocated to the condemned building and lot, see footnote 26—for the 2-⅕ months from April 19 to June 30, 1950, or $385. We note that the government makes no claim against Floor Coverings for use of the property from June 30, 1950 until the end of the first week of August of 1950, the date Floor Coverings terminated its operation of the rug factory.

[28] As noted in Part I, if for any reason Floor Coverings is unable to collect the sum of $626.49 from Torres, the People will be liable to Floor Coverings therefor.

MR. JUSTICE BELAVAL, dissenting.

On April 19, 1950, The People of Puerto Rico condemned. a parcel of land belonging to Carlos J. Torres and his wife Estela Alcaide de Torres, situated in the ward of Hoyos, Mulas of the municipality of Carolina, Puerto Rico, on which certain structures were erected. The People deposited in the former Court of Eminent Domain the following amounts: $1,528.52 for the land and $17,747.50 for certain structures. and improvements existing on the parcel. Part of the land. taken and the existing structures were leased to the Sociedad McCormick Alcaide & Co., S. en C., a partnership actually controlled by the spouses owners of the land. Since we are concerned with reversionary interests, we shall study the issue from the standpoint that there is an identity of interests between the Sociedad McCormick Alcaide & Co., S. en C., and the Torres-Alcaide spouses as respects any possible liability to the last lessee, the Floor Coverings Company of Puerto Rico, Inc. The property leased to Sociedad McCormick Alcaide & Co., S. en C., was in turn leased by the latter to Floor Coverings Company of Puerto Rico, Inc., under a written. contract which was not recorded in the Registry of Property and which would expire some time in September 1951.

There is no question that any rights which the last lessee may have in this case were not reckoned in the appraisal made by The People of Puerto Rico for the purpose of fixing the compensation to be deposited in court, and, therefore, the possible lease value of the Floor Coverings Company of Puerto Rico, Inc., was not included in the sum deposited.

The position taken by The People of Puerto Rico is that, since the amount deposited was the physiocratic value of the property, it should be understood to include any claim of the lessee against the lessor or against the owners of the land, and, therefore, that such claims should be paid out of the sum deposited as just compensation. The position taken by the condemnees is that the compensation received by them did not include any amount representing the possible value of

the last lease; and that, in the event it was included and it was their duty to pay the same, the leasehold had no market value. The position taken by Floor Coverings Company of Puerto Rico, Inc., the lessee, is that someone must compensate it for the value of the lease; that if The People failed to take it into consideration when fixing the value of the condemned property, The People was bound to deposit an additional amount, within the reasonable compensation of the property, for the value of the last lease; that, on the contrary, if the value had been included in the appraisal and was included in the compensation withdrawn by the owners of the land, the owners were bound to pay the leasehold value. We agree that the respective theories of the parties are not expounded in the written debate of the proceeding as clearly as they should have been, for a better elucidation of the case. Yet, the brief abstract made by us in the preceding paragraph presents more or less the true position taken by the parties during the proceedings.

The trial judge concluded that the leasehold of Floor Coverings Company of Puerto Rico, Inc. was compensable and that it was not included in the appraisal of the property on which the compensation deposit was based, and rendered judgment ordering The People of Puerto Rico to pay a certain sum which constituted *the market value* of the last lease. On appeal, The People of Puerto Rico maintains that the former Court of Eminent Domain of Puerto Rico erred in concluding that the sum deposited by The People of Puerto Rico as representing the *value of the property* did not include *the rights of the second lessee*, and that it erred in holding that The People of Puerto Rico was bound to appraise the leasehold and to pay for it. The condemnees and owners appeal from that part of the judgment holding that the lease contract made by McCormick Alcaide & Cía., S. en C., and Floor Coverings of Puerto Rico, Inc. had terminted by virtue of the condemnation of the land and the buildings on April 19, 1950, and

that the lessor had no right to collect rent on the uncondemned portion of the leased property. The second lessee appeals from that part of the judgment which denies it the right to recover the expenses of moving industrial equipment from the condemned premises, loss sustained as a result of the suspension of its industrial activities during the time taken in moving its industrial machinery, and costs for reinstallation in its new premises, and denies it the right to recover from the Torres-Alcaide spouses the proportionate part of the cost of the improvements made by the corporation on the condemned estate.

The law involved in this case is § 2, ninth paragraph, of the Organic Act of Puerto Rico of 1917, which provides: "Private property shall not be taken or damaged for public use except upon payment of just compensation *ascertained in the manner provided by law*"; § 282 of the Civil Code of Puerto Rico, 1930 ed., as amended by Act No. 300 of April 12, 1946 (Sess. Laws, p. 774) which provides: "No person shall be deprived of his ownership except it be by a competent authority and for a justified purpose of public utility or social benefit, and upon payment of just compensation *which shall be fixed in the manner provided by law*." The law establishing the manner for fixing the compensation is the Condemnation Act of 1903 (Sess. Laws, p, 50), as amended by the Act of March 11, 1908 (Sess. Laws, p. 94), the Act of March 12, 1908 (Sess. Laws, p. 96), Act No. 68 of September 3, 1910 (Spec. Sess. Laws, p. 41), Act No. 73 of July 20, 1921 (Sess. Laws, p. 674), Act No. 50 of April 28, 1930 (Sess. Laws, p. 400), Act No. 44 of August 6, 1935 (Spec. Sess. Laws, p. 508), Act No. 2 of April 1, 1941 (Sess. Laws, p. 284), Act No. 19 of November 30, 1942 (Spec. Sess. Laws, p. 82), Act No. 216 of March 27, 1946 (Sess. Laws, p. 422), Act No. 105 of May 7, 1948 (Sess. Laws, p. 240), Act No. 148 of April 29, 1949 (Sess. Laws, p. 394), and Act No. 286 of March 12, 1949 (Sess. Laws, p. 844).

The first problem confronting us is this: In a condemnation case, are the rights of an unrecorded lease compensable? The lease is one of the group of rights inhering in a juridical thing, which as a whole constitute the ownership right to a specific thing. In the concept of our Civil Code as well as in the concept of our Condemnation Act of 1903, as subsequently amended, it has been established that the ownership right is not absolute, unitarian, to which all other property rights, comprised in the power to dispose of the property, are subjected, but a group of all rights constituted or inhering in a juridical thing, in pursuance of law. The absolute concept of ownership, called dominion, or simple ownership, has not been favored by any school of juridical thought and has been relegated as a medievalism proper of the feudal mentality. In his *Compendio del Derecho Civil de España*, Felipe González Rojas' ed., Marco Tulio states at pp. 168 and 169 the following: "Ownership has been defined in several ways, among the many existing definitions, [and] we shall confine ourselves to the following: 1. Of the Roman Law: 'Power exercised over a corporeal thing, from which emerges the right of using, disposing of, and vindicating a thing (*jus utendi, abutendi, et vindicandi*)'; 2. Of the *Ley de Partida:* 'Dominion (sonorie) is the power which one has over the things that belong to him; to do with them as he thinks fit, according to the law of God and man'; 3. Of the Civil Code: 'Ownership is the right to enjoy and dispose of a thing without further limitations than those established by law'; In fact, from a comparison of these definitions we find none as precise as the Roman law: " 'the right to use, to dispose of, and to vindicate,' said the Romans, expressing with those words the real essence of the ownership right, which permits the owner of a thing to do with it as he sees fit, but not in an irrational way, abusing it as some have translated the word *abutendi*, but using it in consonance with its nature; we have said the right to use a thing *jus utendi* to indicate that one may use it, enjoy it, take the profits of it, etc., in such manner as he may

see fit; *jus abutendi*, to express that in the use of the thing one may even consume it, if it is one of those things which are consumed by use; *jus disponendi*, or the right to dispose of the thing as one wishes, either by conveyance to someone else, or alienation, or encumbrance, or mortgage, etc.; and *jus vindicandi*, to indicate that one has the right to exclude anyone from the possession of the thing, that he may revendicate it from any possessor who may have it in his possession; the modern definitions do not define the concept of ownership with the same precision as the Roman Law, because they have tended to reconcile the powers inherent in the ownership or dominion with the indispensable limitations for the sound use of the things; hence, it has been stated in the Civil Code as well as in the Code Napoleon that it is the right to enjoy and dispose of a thing without further limitations than those prescribed by law; that is, that the idea of limitation prevails." In this connection, see 3 Manresa 130 (6th ed. by Editorial Reus) (1934).

In the case of a lease contract recorded in the Registry of Property, the ownership right secured by the thing, represented by the recorded lease, becomes a real encumbrance which affects not only the owner's right to dispose of the leased property, but also the real property or corporeal thing itself on which the lease is constituted. In this case the value of the leasehold, capitalized like any other real right, is a part of the value of the thing, as is a mortgage, an annuity, a real property right of use or habitation.

In the case of an unrecorded lease contract, the situation is different. Section 1461 of the Civil Code of Puerto Rico, 1930 ed., provides that "the purchaser of a leased estate has a right to terminate the lease in force at the time of making the sale, unless the contrary is stipulated and the provisions of the Mortgage Law prevent. If the purchaser should make use of this right, the lessee may demand that he be permitted to gather the fruits of the crop corresponding to the current agricultural year *and that he be indemnified by the*

*vendor for the losses and damages he may have suffered."*
From all of which it follows that if the termination of an unrecorded lease is brought about by *a voluntary act* of the former owner, such owner is bound to compensate the damages caused to the lessee, who must vacate the leased premises before the legal expiration of his contract.

However, where the leased object or thing is taken for public purpose, there is no question that the termination of the unrecorded lease is not due to *a voluntary act* of the former owner but to the action of a person having a social right paramount to that of the former owner and to that of the lessee himself. Yet, this paramount social right may not be exercised by the State without duly compensating all persons having a title of ownership or interest in the condemned object or thing, and all persons sustaining damages as a result of such taking. Theoretically, there may arise the problem of the condemnor's liability viewed from two aspects: (1) the State, upon acquiring all the property rights to the object or thing taken, is substituted for the former owner in all liabilities of the latter to the lessee; (2) the State, in the exercise of its paramount social right, is bound by constitutional provision to compensate the right of the owner of the thing as well as the interest which any person may have therein, and the damages which any person may suffer by virtue of the acquisition of possession of the thing. Therefore, whether it is a case of subrogation or a case of extinguishment of a right by the prior payment of the corresponding compensation, the State becomes liable for payment for the owner's right as well as for the right of the person having an interest in the thing, and for the damages caused to the lessee who holds the premises under an unrecorded lease.

The twofold aspect of the State's liability will be better understood by studying the original concordance of our Condemnation Act of 1903 with the Civil Code of Puerto Rico of 1902. Section 335 of the 1902 ed. of the Civil Code of Puerto Rico, which became § 282 of the 1930 ed. and to which ref-

erence is made in § 1 of the Condemnation Act of 1903, provided that: "No person shall be deprived of his ownership, except it be by a competent authority and for a justified purpose of public utility, and after having been properly indemnified; if this requirement has not been complied with, the district courts shall protect and, in proper cases, replace the owner in possession of the expropriated property; the indemnification shall comprise, not only *the value of the thing* whereof the owner is deprived, but also a compensation for any damages and injuries which may be caused him by the deprivation of the property," such as the compensation which the owner would be bound to pay to the lessee for the termination of an unrecorded lease before expiration. As has been noted, in the original wording of § 335 of the Civil Code of Puerto Rico, on which our Condemnation Act of 1903 is based, a distinction was clearly made between the physiocratic value of the thing, as real or corporeal property, and the value of the other profits affected by the taking and the other damages caused by it. It is true that after the Amendment of this section by Act No. 300 of April 12, 1946, its provisions read as follows: "No person shall be deprived of his ownership except it be by a competent authority and for a justified purpose of public utility or social benefit, and upon payment of just compensation which shall be fixed in the manner provided by law."

Still, upon examination of § 4 of the Condemnation Act of 1903, as amended by Act No. 105 of May 7, 1948, which includes a further provision to the effect that "The complaint may be directed against the owners of the estate, the occupants thereof, and *all other persons* having a right or *interest* therein; or it may be directed against the property itself. In this latter case, the complaint shall recite, as far as it may be possible for the plaintiff to determine, the names of all persons who as *owners*, *occupants*, or *holders* of any right or *interest* in the estate, must be served with notice of the proceedings, to the end of any right they may have to the compen-

sation fixed for the *value of the* condemned *property, or to any damages* that may arise from the proceedings," once more legislative will sanctions the former concept of *considering the value of the thing* taken as something separate and independent of the *value of other rights* therein, which is consonant with the original provision of § 5 as to that portion excluded from the amendments to § 5, which reads: "All persons *in occupation of,* or having or claiming an interest in any of the property described in the complaint, or in the *damages* for the taking thereof, . . . may appear, plead and defend, each in respect to his own *property* or *interest* or that claimed by him. . .in the complaint." (Italic ours.)

Conclusion: The compensation provided by the Condemnation Act of 1903 is greater than the compensation for the mere physiocratic value of the thing, and, hence, the following are compensable: (1) the value of the thing as real property, and (2) the other grouped property rights inhering in the thing, such as the rent, the mortgage, the use, the habitation, the lease. Where leased property is condemned, the lease recorded in the Registry constitutes a real encumbrance which affects the value of the thing and should be reckoned as part of its value. If the lease is not recorded, compensation will be required for the damages to the lessee.

The two major obligations of the Puerto Rican State in a case of condemnation of private property are (1) the payment of just compensation to all persons having an ownership right or any interest in the thing condemned, or who suffer any damage, or both, as result of the taking, as already seen, and (2) the notice required not only by the statute but also by due process of law, in order that all persons affected by the condemnation may appear to assert their respective rights. In the instant case it seems to have been assumed that the State was bound to compensate only the owner of the condemned property, or the owners of the real rights recorded in the Registry of Property, and no notice was given to the lessee. There is evidence that the owners of the land and

buildings informed the condemning officers, both in writing and verbally, of the existence of the lease. In *United States v. Certain Parcels of Land*, 40 F. Supp. 436, 444 (Chesnut, 1941), it was held that the interests of unnamed and unknown parties are not concluded by the proceedings, even though the government has taken title and possession to the land and the fund has been fully distributed by the court because the general principle of due process is that no person is bound by court proceedings who has not been a party to the proceedings. Regarding the need to notify any person of the disposition to be made of the compensation, even if such person has failed to appear in the proceeding after being summoned, see *People v. 632 Sq. Meters of Land*, 74 P.R.R. 897, 915 (Snyder, 1953). See, also, *Musanti v. State*, 131 N.Y.S. 20, 21 (Rodenbeck, 1911).

After fixing the value of the property, of the rights of every person having an interest therein, and of the resulting damages to the occupants, possessors, usuaries, or lessees, the next important step of the condemnation proceeding is the notice. In Puerto Rico it should not be difficult to determine the true owners of a property, since there is an official record in the Registries of Property as to the condition of the titles and other real rights. In the case of unrecorded properties, the condemnor should be guided not only by the information obtained from wrongful tenants (*precaristas*), occupants, usuaries, or lessees, but also by the procedure of summons by edicts of all other unnamed or unknown persons who may have an interest in the condemned property or who may suffer some damage by the condemnation. As a matter of law, the State's liability continues until all the rights of all persons having a title, share, or interest therein have been adjudicated within the condemnation proceeding.

Although the State, by subrogating itself to the liabilities of the owner or of the sublessor, is bound to compensate the owner of an unrecorded lease for the damages that might have been foreseen at the time of contracting the obligation

and which may be a necessary consequence of its nonperformance, it is not bound to compensate all the damages suffered by the lessee. The damages which it is bound to compensate are those mentioned in § 1461 of the Civil Code of Puerto Rico. The Judgment of November 3, 1892 of the Supreme Court of Spain, commented on in 10 Manresa 660, 5th rev. ed. of 1950 by Instituto Editorial Reus, establishes that "The damages for which the vendor of a leased estate is liable to the lessee are those foreseen, or that might have been foreseen at the time of incurring the obligation and which are a necessary consequence of its nonperformance. Section 1107 [our § 1060] is therefore applicable, and the vendor is considered a debtor in good faith. The question involved was the eviction of a photographer, and the vendor was ordered to compensate only: (1) the moving expenses; (2) the dismounting and installation of the premises used in the industry; (3) the dismounting and reinstallation of the portal for publicity; and (4) the cost of the materials rendered useless."

In view of the failure of the Condemnation Act of 1903, as amended, to specify what damages are compensable, we must apply § 1461 of the Civil Code of Puerto Rico in order to determine what damages are actually compensable in the case of an unrecorded lease. It has been seen that the vendor of the leased property is considered a debtor in good faith, unless it is otherwise established, a principle which seems very logical where the subrogated vendor is the State, the presumption being that it is acting for the public benefit.

Applying this principle to the modern realities of manufacturing plants, the following are compensable: (1) moving expenses from the condemned manufacturing plant to the new plant leased or constructed; (2) expenses of dismounting the machinery in the condemned manufacturing plant and of remounting in the new plant leased or constructed; (3) the industrial material rendered useless by the change or moving from one plant to another, in the case of

machinery or artifacts manufactured or constructed to be installed in a specific area.

By the same token, damages will not be allowed for interruption of the industrial activities, or for the loss of some of the annexes erected to facilitate the use of the leased premises, or for the loss of time or money spent in training a new group of industrial workers in a different zone, since the foreseen damages are those of the "anticipated eviction."

Regarding the improvements made by the lessee in the condemned industrial plant, the contract made by the second lessor and the second lessee, intervener herein, specified that the improvements would inure to the benefit of the lessor at the expiration of the lease. The only effect of the condemnation was to anticipate by one year more or less the legal expiration of the lease. The compensation would be for the loss of the use of the improvements made in the plant. The evidence established that the improvements were made jointly by the lessor and the lessee; that the improvements were permanent for the purpose of converting a barn into an industrial factory; that the lessee spent $4,176.66 for its portion of the improvements under the contract. In fact, this damage is not properly comprised in the compensation allowed to the lessee of an unrecorded lease contract, terminated by the condemnation proceeding. This is an unsual case in which the ownership of the improvement belongs to the owners and the use to the lessee. The lessee may therefore be regarded, in addition to lessee, as an usuary of the improvement. As usuary, it would be entitled to a compensation wholly independent of and apart from the compensation to which it would be entitled as lessee. The trial judge considered it as money invested and unexpended, and, in order to compensate it, he divided the amount invested by the lessee in the improvements by the number of months comprised in the full term of the contract. After obtaining the cost of the improvements per month, he multiplied the same by the number of months remaining at the time of the condemnation, a

formula which seems more logical and sane in this particular case, in order to determine the proximate value of the use. We note, however, a slight error in estimating the number of months which had yet to run. As admitted by factory manager Molina (Tr. Ev. 56), the factory was operated until the first week of July 1950. The contract was to expire on July 31, 1951, or 13 months in all. The money spent by the lessee in the improvements was $4,176.66. Dividing this sum by 60 months, the life of the lease, the result is a monthly investment of $69.61 in addition to the rent. Multiplying this sum by the remaining 13 months of the contract, gives $904.94. Since the interruption in *the use of the improved property* is caused by the condemnation, it is only fair that the State rather than the lessor pay the compensation.

Another matter tangent to the appraisal is the contention of the owners or lessors that, since the condemnation was not total because a dwelling occupied by the directors or employees of the lessee as a residence was not taken, the lease contract remained in effect as to the dwelling and it was the lessee's duty to pay to the condemnees or lessor partnership the proportionate rent of the dwelling. The lessee alleges, on the contrary, that the lease contract was necessarily rescinded in its entirety, since the house, without the manufacturing plant, was of no use to it. Although we have refused to allow compensation for any damages in the case of unrecorded leases other than those anticipated at the time of making the contract, we cannot overlook the fact that there is involved another germane issue, posed within the proceeding, by reason of the fact that the trial judge admitted evidence on this point and expressed his opinion thereon, and that it was assigned as error by the owners and the lessor. Moreover, if we were to hold that the owners or lessors are entitled to receive that rent, there is no question that we would have to consider damages caused by aggravation and to which the lessee would be entitled as damages independent of

the anticipated eviction. Let us see whether, as a question of law, the owners or lessors are right.

Section 1458 of the Civil Code of Puerto Rico, 1930 ed., equivalent to § 1568 of the Spanish Civil Code, provides that "If the thing leased is lost or any of the contracting parties do not comply with what has been stipulated, the provisions of sections 1136, 1137, 1054 and 1077 shall be respectively observed." Of these four sections, the one actually bearing on this point is § 1077, which provides that "The right to rescind the obligations is considered as implied in mutual ones, in case one of the obligated persons does not comply with what is incumbent upon him. The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission, with indemnity for damages and payment of interest in either case..." In legal substance, condemnation produces the compulsory nonperformance of all the obligations affecting the condemned property. In cases of leases on the condemned property, where the lessor must of necessity fail to comply with the conditions of the lease and the condemned property *is lost or partially destroyed*, we must determine whether "that essential change of condition which renders it unfit for the purpose for which it was devoted" has taken place. 10 Manresa 632 (ed. cit.) In the instant case the principal real property was the factory. The dwelling was occupied by the directors or employees so they could live near the manufacturing plant. Once the factory is destroyed, the dwelling undergoes an essential change of condition which renders it unfit for the purpose to which it was devoted. This being so, the lessee could rescind the lease in its entirety as a result of the unavoidable failure to comply as well as of the change undergone by the leased property, and the owners-lessors have no right to continue receiving rent for the use of the house and the land on which it is erected, it being the duty of the owners-lessors to pay over to the State the rent received from the moment the court issued the order to surrender the condemned property.

The judgment should therefore be modified awarding to the lessee and intervener Floor Coverings Company of Puerto Rico the following amounts:

1. For the interrupted use of the improvements made by it............................ $904. 94
2. Five-hundred hours moving labor at 35 cents per hour (Tr. Ev. 68)................. 175. 00
3. Twenty-two 12-mile trips, or 264 miles, at 15 cents, and $40 wages to the chauffeur.... 79. 60
4. Rent of lift truck for 5 days at $20 per day (Tr. Ev. 70)...................... 100. 00
5. Rent of long machinery, winches, and blockings (Tr. Ev. 70)..................... 100. 00
6. Supervision of work, 2 weeks (Tr. Ev. 70).. 300. 00
7. Frame which could not be used because of inadequacy of new premises............. 2, 000. 00

which should be paid by The People of Puerto Rico with legal interest from July 1, 1950.

The majority opinion, arriving at a different result, contains a series of assertions with which I cannot agree. Assuming, without deciding, that our condemnation proceeding were always in rem, it would only mean that the claims by persons with a right or interest in the property, instead of being directed against the property, should be directed against the funds which substitute it. This purely procedural aspect of condemnation does not affect the rights against the fund. *United States* v. *Petty Motor Co.*, 327 U. S. 372, 376, 90 L. Ed. 729, 734 (Reed, 1946).

Again I fail to see how the right to compensation may be affected by the type of title acquired by the State. The assertion in the opinion of the majority that what the Government condemns is the absolute dominion title to the property taken but not the diverse interests of defendants specifically, seems to bear the implication itself that the "absolute dominion title" does not include any of the rights or interests of the usuaries, lessees, usufructuaries, annuitants, mortgagees,

or any other persons with real or contractual rights to the thing taken. This statement is so serious that I have decided to expand my previous analysis as to what constitutes the right of ownership, in order to determine the true meaning of the concept of "absolute dominion title."

The Condemnation Act of Puerto Rico has only two sources of inspiration: the Condemnation Act of January 10, 1879 of Spain, coordinated as to its terminology and definition of rights with the Spanish civil law, and Public Law 736 of February 26, 1931 of the United States Congress, relating rather to only one aspect of our condemnation proceeding: the order to take and deliver, coordinated as to its terminology and definition of rights with the federal decisions. There can be no doubt of the coordination of the principles of our Condemnation Act with our Civil Code. Our Condemnation Act does not purport to define any of the rights therein referred to, but rather employs them in the generic acception which they have in our Civil Code.

Our Condemnation Act does not define the meaning of "absolute dominion title". In the Spanish and Puerto Rican legislations, which are contemporaneous with the Spanish and Puerto Rican condemnation laws, the concept of absolute dominion title *mancipium* (spoils of war), *dominium* (quiritary title, seigniory) does no exist, as would have been understood in the age of the Gothic monarchy or the Arab rule, which was the actual feudal period of the Spanish law. It may be asserted with absolute certainty that since 1811 in the Spanish civil law, after which our law is patterned, the territorial and manorial seigniories were reduced to mere rights of individual ownership. The same may be said of family estates, abolished since 1820. When our Civil Code speaks of ownership (dominion) its divisibility is consecrated according to the transformation of the old manorial servitude: dominium directum, dominium utile, or it is considered as one, among others, of the real rights. (Section 545 of the Civil Code of Puerto Rico, 1930 ed.) In the Spanish Civil Code and the

Civil Code of Puerto Rico in force at present, the accepted term is ownership right (*proprietas*), as already stated, which is considered as a group of property rights inhering in the thing which is the object of the contract. III–I Puig Peña, *Tratado de Derecho Civil Español* 66 (ed. by Revista de Derecho Privado). That is why, in referring above to the ownership right, we consecrated its divisibility among the rights to use, abuse, dispose of, and vindicate the thing, following Marco Tulio's commentaries.

The federal jurisprudence has long since set aside the theory of that type of English agnatic family estate, derived from the Roman system of *feudum talliatum* (fee tail), and adopted the theory of fee simple, a group of rights inhering in the thing. In *United States* v. *General Motors Corp.*, 323 U. S. 373, 377–78, 89 L. Ed. 311, 318 (Roberts, 1945), the concept of fee simple was defined as follows: "The correctness of the decision of the court below depends upon the scope and meaning of the constitutional provision: 'nor shall private property be taken for public use, without just compensation'. The critical terms are 'property,' 'taken,' and 'just compensation.' It is conceivable that the first was used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, it may have been employed in a more accurate sense to denote *the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it*. In point of fact, the construction given the phrase has been the latter. When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the *relation to that thing, which we denominate ownership*. In other words, it deals with what lawyers term the individual's 'interest' in the thing in question. That interest may comprise *the group of rights for which the shorthand term is 'a fee simple'* or it may be the interest known as an 'estate or tenancy for years,' as in the present instance."

(Italics ours.) In that case it is also held that the constitutional provision of just compensation is addressed *to every sort of interest* the citizen may possess. 323 U.S., at 378; 89 L.Ed., at 318.

Whether the concept "absolute dominion title" is considered as a group of property rights inhering in a thing, according to the civil-law theory, or as a group of rights inhering in the citizen's relation to the physical thing, it is clear that the absolute dominion title (fee simple) is not a right integrated in itself, capable of immobilizing other property rights, according to its medieval conception, but all the property rights to the thing which is the object of the contract. The significance of defining clearly and accurately the scope as well as the meaning of this concept, in condemnation matters, lies in the fact that it is intrinsically related to the distribution of the just compensation. The divisibility of the title entails the divisibility of the right or interest and, hence, the divisibility of the compensation.

Condemnation laws are, however, essentially procedural laws. The nature, definition, and scope of the rights recognized therein are not defined in those laws. Therefore, in order to find such nature, definition, and scope we must look to the substantive laws, which ordinarily provide everything concerning those rights.

Section 1461 of the Civil Code of Puerto Rico (1930) expressly provides that "the purchaser of a leased estate has a right to terminate the lease in force at the time of making the sale, unless the contrary is stipulated, and the provisions of the Mortgage Law prevent. If the purchaser should make use of this right, the lessee may demand that he be permitted to gather the fruits of the crop corresponding to the current agricultural year and that he be indemnified by the vendor for the losses and damages he may have suffered."
At first glance, this section, as drawn up, seemingly applies to rural leases exclusively. But this is not so. It applies to

rural and to urban leases as well. Judgment of September 27, 1905 of the Supreme Court of Spain.

As may be seen, pursuant to the Civil Code a lessee under a fixed-term contract, not recorded in the Registry of Property, is entitled, at the time the property is sold by the owner, to be indemnified for the damages he may have suffered by the vendor, former lessor. In a condemnation case the sale is compulsory and, hence, the State "is substituted for the lessor and pays the compensation which the latter may be bound to pay because of the termination of the lease contract." 10 Planiol Ripert, *Derecho Civil Francés*, 836–37. The fact that the compensation is for damages presents no problem, since our former Organic Acts as well as our present Constitution provided just compensation for the value of the thing itself as well as for the damages caused by the taking. *People* v. *García*, 66 P.R.R. 478, 484 (De Jesús, 1946) ; *People* v. *Soc. Agric. Mario Mercado e Hijos*, 72 P.R.R. 740, 746 (Todd, Jr., 1951).

Summing up our local law, it has been held by the majority opinion that, when dealing with the condemnation of a property leased for a fixed term without a recorded lease, the compensation to the lessee must be computed on the market value of the lease rather than on the damages suffered. The supporting authorities are characteristic of those cases wherein the lessee's right to compensation for damages resulting from a compulsory sale of the leased property was not regulated by the local law, as is the case in Puerto Rico. Some of them deal with leases containing automatic-expiration clauses in the event of condemnation. Those authorities are not therefore of such strict application as to lead us to reason differently the literal interpretation of our law. The appraisal of unrecorded leases on the basis of the market value would result in a more cumbersome burden to the State than the burden which an individual must bear by reason of the breach of an unrecorded private lease contract.

For the reasons stated, I must dissent.